## AMERICAN SURETY CO. v. PAULY.

(Circuit Court of Appeals, Second Circuit. February 20, 1896.)

### No. 56.

1. FIDELITY INSURANCE—NOTICE OF LOSS—REASONABLE TIME.

The A. Surety Co. executed and delivered to the C. Bank a bond, insuring the bank against loss by any act of fraud or dishonesty of its cashier in connection with the duties of that office, or the duties to which, in the bank's service, he might be subsequently appointed, occurring during the continuance of the bond, and discovered within six months thereafter, and within six months from the death, dismissal, or retirement of the cashier from the service of the bank. The bond provided that the surety company should be notified of "any act" of the cashier which might involve a loss for which the company would be responsible "as soon as practicable after the occurrence of such act shall have come to the knowledge" of the bank, and it required proofs of loss to be furnished to the surety company. The bank suspended payment, and passed into the hands of a receiver, who afterwards notified the surety company of the discovery of dishonest acts of the cashier, furnished proofs of loss, and brought suit against the surety company on the bond. The evidence upon the trial as to the time when the dishonest acts of the cashier were discovered being conflicting, *held*, that the question whether the required notice was given with reasonable promptness was for the jury.

2. SAME—SUSPICIONS.

*Held*, further, that the terms of the bond did not require notice to be given of suspicions of dishonest acts.

3. SAME—ACTS IN SERVICE OF EMPLOYER.

The bank having suspended business on November 12, 1891, but the cashier having continued in the service of the receiver until March following, when he resigned, *held*, that the services so rendered by him after November 12th were rendered to the bank none the less because its affairs were controlled by a receiver, and the surety company was not absolved from liability for acts discovered more than six months from November 12th, but within six months from his resignation.

4. SAME—PROOFS OF LOSS—INTERPRETATION.

*Held*, further, that a proof of loss under the bond, which set forth with reasonable plainness, and in a manner by which a person of ordinary intelligence could not be misled, that certain sums of money had been taken from the bank by means of acts of the cashier, described in such proof, was sufficient, though it failed to aver explicitly that a loss had been caused to the bank.

5. EVIDENCE—BOOKS OF ACCOUNT.

The "teller's book" of the bank, which had been kept by one G., who died before the trial, was offered in evidence, to show that on certain

days no money was received for certificates of deposit. *Held* that, in connection with evidence of the course of business, by which, if received, such money would be entered in the book, the evidence was competent, though not conclusive.

6. SAME.

For the purpose of showing the dealings with the bank of the president, who was charged with having misappropriated the bank's money with the cashier's aid, the president's ledger account was put in evidence, together with the testimony of the bookkeeper who made the entries, and who swore that they were correctly made from the original deposit slips and checks furnished to him by the teller, who had died before the trial; that it had been the teller's duty to verify all deposit slips, and to pay the checks; and that all such slips and checks, when reaching the bookkeeper's hands, bore marks indicating that they had been verified or paid by the teller. *Held*, that the account was competent, and sufficiently proven.

7. SAME—SIMILAR BUT DISCONNECTED ACTS.

*Held*, further, that evidence of acts of fraud and dishonesty by the cashier, occurring before the date of the bond, and for which no claim was made against the surety company, but which were similar to the acts on which the claim was based, was admissible to show that the acts on which the claim was based were intentional, and not merely negligent, or due to oversight.

8. CORPORATIONS—NOTICE—KNOWLEDGE OF OFFICERS.

Prior to the issue of the bond sued on, the cashier and president of the bank had conspired to rob it, and had been engaged in fraudulent practices. When application was made for the bond, the surety company required a certificate from the bank of the cashier's good character. Such certificate was made by the president without, so far as appeared, any direct authority from the board of directors, or any knowledge by them that such certificate was made or required. *Held*, that the president's knowledge of the cashier's dishonesty was not to be imputed to the bank, so as to make it responsible for the misrepresentations contained in such certificate.

In Error to the Circuit Court of the United States for the Southern District of New York.

This was a writ of error to review a judgment for $17,435.39 rendered against the American Surety Company, defendant below, in the circuit court, Southern district of New York. The plaintiff below sued as receiver of the California National Bank, at San Diego, to recover the amount of $15,000, to which extent the surety company had contracted to make good any loss resulting from the fraud or dishonesty of one George N. O'Brien, the cashier of said bank. The judgment was entered upon the verdict of a jury.

George A. Strong, for plaintiff in error.

Wm. Mitchell, for defendant in error.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. One J. W. Collins, who had been cashier from the organization of the bank, in 1888, became its president in 1891. Thereupon George N. O'Brien was promoted, and made cashier. He applied to the defendant for a bond of indemnity to date from July 1, 1891, for $15,000, in favor of the bank, as security covering his position in the bank's service. The defendant is a New York corporation, engaged in the business,

among other things, of issuing surety or guaranty bonds for persons in positions of public or private trust; and upon said application, and in consideration of a premium duly paid, it executed and delivered the bond in suit, which is correctly described by the trial judge as "in legal effect an insurance policy, by which the defendant undertook to guaranty the bank against loss arising from the fraud or dishonesty of O'Brien." The material parts of such bond are as follows:

"This bond, made July 1, 1891, between the American Surety Company of New York,, * * * of the first part, and George N. O'Brien, * * * hereinafter called the 'employé,' of the second part, and California National Bank, hereinafter called the 'employer,' of the third part. Whereas, the employé has been appointed in the service of the employer, and has been assigned to the office or position of cashier by the employer, and has applied to the American Surety Company of New York for the grant by it of this bond: Now, therefore, in consideration of the sum of $75 * * * as a premium for the term of twelve months ending on the first day of July, 1892, at 12 o'clock noon, it is hereby declared and agreed that, subject to the provisions herein contained, the company shall, within three months next after notice, accompanied by satisfactory proof of a loss, as hereinafter mentioned, has been given to the company, make good and reimburse to the employer all and any pecuniary loss sustained by the employer of moneys, securities, or other personal property in the possession of the employer, or for the possession of which he is responsible, by any act of fraud or dishonesty on the part of the employé in connection with the duties of the office or position hereinbefore referred to, or the duties to which in the employer's service he may be subsequently appointed, and occurring during the continuance of this bond, and discovered during said continuance, or within six months thereafter, and within six months from the death or dismissal or retirement of the employé from the service of the employer. It being understood that a written statement of such loss, certified by the duly-authorized officer or representative of the employer, and based upon the accounts of the employer, shall be prima facie evidence thereof: provided, always, that the company shall not be liable by virtue of this bond for any mere error of judgment or injudicious exercise of discretion on the part of the employé in and about all or any matters wherein he shall have been vested with discretion, either by instruction or rules and regulations of the employer. And it is expressly understood and agreed that the company shall in no way be held liable hereunder to make good any loss which may accrue to the employer by reason of any act or thing done or left undone by the employé in obedience to or in pursuance of any direction, instruction, or authorization conveyed to or received by him from the employer or its duly-authorized officer in that behalf. * * * The following provisions also are to be observed and binding as a part of this bond: That the company shall be notified in writing at its office in the city of New York of any act on the part of the employé which may involve a loss for which the company is responsible hereunder as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer. That any claim made in respect of this bond shall be in writing, addressed to the company, as aforesaid, as soon as practicable after the discovery of any loss for which the company is responsible hereunder, and within six months after the expiration or cancellation of this bond, as aforesaid. And upon the making of such claim this bond shall wholly cease and determine as regards any liability for any act or omission of the employé committed subsequent to the making of such claim, and shall be surrendered to the company on payment of such claim. That the company shall not in any wise be responsible under this bond to a greater extent than $15,000. * * * That no suit or proceeding at law or in equity shall be brought to recover any sum hereby insured, unless the same is commenced within one year from the making of any claim on the company."

The bank suspended payment, and its assets were taken possession of by the bank examiner November 13, 1891. The plaintiff

was appointed receiver, and duly qualified as such on December 29, 1891. Having discovered, as he believed, acts of fraud and dishonesty on the part of O'Brien, resulting in loss to the bank, the receiver, after giving written notice, and sending to the company written proof of loss, the receipt of both of which was acknowledged, began this suit. By the complaint and the bill of particulars recovery is sought for various items, but at the close of the trial the court left it to the jury to determine as to certain transactions of October 13 and 14, 1891, only. The facts relating to these transactions are, briefly, as follows: On October 12, 1891, Collins, the president, was in New York, and effected a loan from the Western National Bank of that city to the California Bank. This loan was made on a note of the California Bank for $20,000, and on the security of promissory notes the property of the California Bank amounting to $36,230. The proceeds of the loan were credited by the Western National Bank to the California Bank, and subsequently drawn out by it. The loan was to the bank, and not to Collins. A truthful record of this transaction upon the books of the California Bank would have been a credit of the amount to "Bills payable," and a debit of the same to the Western National Bank. The actual entries on the books are a debit to the Western National. and a credit to J. W. Collins in his individual account, and no credit to "Bills payable." The result of such entries is that the proceeds of the loan obtained on the credit of the California Bank and by pledge of its collaterals, and which should have remained subject only to its disposal, were left subject to the order of Collins by his personal check. These entries were thus made in entire good faith, so far as appears, by the bookkeepers, in consequence of the act of O'Brien. On October 13, 1891, he filled up in his own handwriting a deposit tag, which represented that by telegraphic dispatch Collins had that day made a deposit in the California Bank of "$20,000. Western National." On the same day a precisely similar transaction took place between Collins and the United States National Bank, whereby commercial paper the property of the California Bank was rediscounted, and the transaction falsely recorded on the books of said bank, by reason of a similar false deposit tag, prepared by O'Brien himself. The amount credited to Collins on this tag was $24,500. It thus appeared that, as a result of O'Brien's acts in filling up these two deposit tags with statements which were false in fact, Collins' account with the bank was inflated in the amount of $44,500. It further appeared that when the bank suspended payment on November 12, 1891, there was standing to his credit $11,420.90 only; that is to say, the aggregate amount drawn out by Collins exceeded whatever balance he had standing to his credit on October 12, 1891, plus all subsequent deposits (except the two above described), by $33,079.10. The bank therefore lost that sum by reason of these false credits, for, had it not been for the false credits, Collins' account would have been exhausted, and presumably his checks not honored, before any of this $33,079.10 was

drawn out. That these two deposit tags were written by O'Brien is not disputed. They are in his handwriting. He was called as a witness by plaintiff, but declined to testify, on the ground that his answers might tend to incriminate him, since he was indicted by the grand jury upon certain charges growing out of his connection with the affairs and management of the bank. That the entries upon the tags were false is abundantly established on the proof. They called for entries to the credit of Collins on his individual account of the amounts obtained from the United States Bank and the Western National Bank, and the officers of those banks testified that their transactions of October 12th with Collins were loans, not to him, but to the California Bank. The mere fact, however, that the entries on the tags were false did not by itself prove "fraud or dishonesty" on the part of O'Brien; non constat that he acted ignorantly or negligently. There was, however, evidence that, although Collins' account showed that he had at all times a balance to his credit, he was in fact largely indebted to the bank by reason of other similar false entries; that on other occasions O'Brien himself had made similar entries. O'Brien's age, experience, and connection with the bank were shown, it appearing that he had been in control of the bank (during the absence of Collins) for several weeks at the time this transaction took place. Letters of his were introduced, tending to show knowledge of irregularities, and it was open to the jury upon the proof to infer that O'Brien knew when he made the entries on the tags that they falsely represented the transactions. The court left it to the jury to determine whether O'Brien's action in making these entries, manifestly false, was or was not dishonest or fraudulent. The jury were charged that: "If the conduct of the cashier in that transaction was a mere error of judgment, was an honest irregularity, plaintiff could not recover; but if he, knowing Collins was not entitled to be credited with these two items, believing that he was not entitled to be credited with them, nevertheless put those items to his credit, that was a dishonest act, and it was a fraudulent act within the meaning of the bond." The court further charged that "fraud is not to be lightly presumed. Every man is supposed to be honest until the contrary is shown"; and, after reviewing the evidence, instructed the jury that "the burden is upon the plaintiff to satisfy you by a fair preponderance of proof that those credits were given to Collins by the fraud or dishonesty of the cashier." To this part of the charge there was no exception, plaintiff in error relying upon its exceptions to a denial of its motion to direct a verdict. Inasmuch as the entries were conclusively shown to be false, and there was evidence tending to show that O'Brien must have known them to be false, it would have been error to take this question from the jury, and their finding upon the evidence under proper instructions is conclusive.

Various assignments of error remain to be considered.

1. It is contended that the receiver failed to give the notice re-

quired by the bond, which provides that "the company shall be notified in writing * * * of any act on the part of the employé which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer." This notice was given May 23, 1892. The evidence as to when knowledge of O'Brien's improper act was obtained was conflicting. So manifestly is there a conflict on this point that it would be a waste of time to review the evidence in detail. A perusal of the testimony of the receiver reveals it. The proposition contended for, that he is to be concluded by the dates given in his original bill of particulars, subsequently amended, or by his statements when first examined on deposition, is without merit. He manifestly testified solely from his recollection, and it is not surprising that there is a variance between the date stated by him at first and the one subsequently given after his attention had for months been directed to the subject. Conflicts of evidence as to questions of fact are to be determined by the jury, whether they arise upon the testimony of one witness or of two; and in this case there was other evidence tending strongly to support the conclusion which the jury evidently reached, that O'Brien's acts were discovered shortly before May 23, 1892, when the notice was sent. In fact, it is difficult to see how they could have reached any other conclusion. However much the receiver varied in his statements as to the date when he first learned of the falsity of O'Brien's entries he was consistently positive that he acquired his knowledge through the report of an expert, who it is conclusively shown was not employed until April, and who apparently did not himself discover O'Brien's improper acts until May. As there was a conflict of evidence on this point, the court properly left it to the jury to determine under instructions as to what would and what would not be reasonable promptness in giving the notice. Careful and exhaustive instructions were given on this branch of the case; they were not excepted to, save as noted in the next subdivision. The jury were charged that, after acquiring knowledge of the improper act, it was the receiver's "duty, not as soon as possible, to transmit information of it to the defendant; but to do it with reasonable promptness. He was not bound the first day, or the next, necessarily, to give notice, but he was to give notice within a reasonable time; and it is for you to say, upon a consideration of all the circumstances of the case, whether he did, within a reasonable time after acquiring such knowledge, send the letter of May 23d. It might be reasonable under one state of facts; it might be unreasonable under another. What might be very great diligence under one set of circumstances might be very dilatory under another. * * * If * * * discovery was made early in February, and notice was not given until July, that was not notice with reasonable promptness. * * * If the fact was discovered early in February, and notice was not given until the latter part of May, that was not notice given with reasonable promptness. But if you come to the

conclusion that the discovery was not made until the middle or latter part of May, then, in view of the situation of the plaintiff, you may reasonably come to the conclusion that he exercised proper diligence in sending the notice. * * * The burden of proof is with the plaintiff, and you must be satisfied by a fair preponderance of proof that he has fulfilled the terms of the condition [as to giving notice within a reasonable time]." To no portion of the charge as above quoted was there any exception taken. Plaintiff in error apparently contends that the question as to reasonableness of time should not have been left to the jury. The action of the trial judge in thus submitting it to them is sustained by authority. O'Brien v. Insurance Co., 76 N. Y. 459. And see 19 Am. & Eng. Enc. Law, p. 642, where the results of many decisions are thus summarized:

"If the question as to what is a reasonable time is not resolved, expressly or impliedly, by the rule of law, or by the writing which is under consideration, so that the judge, in deciding the question, would have no legal ground, but merely his individual ideas, to go upon; and especially if, in addition, the question depends in the individual case upon peculiar, numerous, or complicated circumstances, the reasonableness of the time becomes a question for the jury, whose province it is, rather than that of the judge, to say, in view of all the facts of the case, whether or not the time in question is reasonable in the sense of being in accordance with the course of business and the ordinary transactions of life."

There was no error, therefore, upon the conflict of evidence in this case, in leaving the question of reasonableness of time in giving notice to the jury.

After the charge, one of the jurors asked whether, "if they found out the fraud on the 2d day of March, and notified the company on the 23d of May, that would be, in law, a notice as soon as practicable." To this the court replied: "No. I should charge, in regard to that, that that is a question for you to determine. It is a question of fact, and not a question of law." To this defendant excepted, but, under the authorities above cited, the charge was sound.

2. Plaintiff in error duly excepted to a statement in the charge that "it is not sufficient to defeat the plaintiff's action upon the policy that it be shown that the plaintiff may have had suspicions of dishonest conduct of the cashier." The court charged, in the same connection, that:

"Defendant was entitled to notice in writing of any such act of the cashier which came to the knowledge of the plaintiff of a fraudulent or dishonest character as soon as practicable after the plaintiff acquired knowledge. * * * It was plaintiff's duty, under the policy, when it came to his knowledge,—when he was satisfied that the cashier had committed acts of dishonesty or fraud likely to involve loss to the defendant under the bond,—as soon as was practicable thereafter to give written notice to the defendant; * * * and in considering this you are to inquire, first, when it was that the plaintiff became satisfied that the cashier had committed dishonest or fraudulent acts which might render the defendant liable under this policy. He may have had suspicions of irregularities; he may have had suspicions of fraud; but he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act which might involve the defendant in liability for the misconduct."

The exception is unsound. The charge carefully conforms to the requirement of the bond. "Knowledge" and "suspicions" are not synonymous terms. The bond calls for no notice of suspicions, but only of any act on the part of the employé which may involve loss as soon as practicable after the occurrence of such act shall come to the knowledge of the employer.

3. It is further contended that the claim or proof of loss which was mailed to the company June 24, 1892, was not served as soon as practicable after discovery. It is unnecessary to discuss this point. It involves reasonableness of time, and was properly left to the jury.

4. It is next contended that, if the date of discovery be taken as May 23, 1892, there can be no recovery under the bond, which provides that the company shall be liable for acts of fraud or dishonesty involving loss occurring during the continuance of this bond, "and discovered during said continuance, or within six months thereafter, and within six months from the death or dismissal or retirement of the employé from the service of the employer." It is insisted that because O'Brien ceased to act as cashier when the bank closed its doors on November 12, 1891, discovery more than six months after that date is fatal to plaintiff's case. There is no merit in this contention. O'Brien ceased to act as cashier on November 12, 1891, because the bank ceased on that day to do a banking business, and thereupon went into liquidation. The bond contemplates service other than as cashier. It insures fidelity on the part of the employé "in connection with the duties of the office or position hereinbefore referred to, or the duties to which, in the employer's service, he may be subsequently appointed." O'Brien was continued in service by the receiver until early in March, 1892, when he voluntarily resigned. He was not dismissed, nor did he retire from the service of his employer, the California National Bank, on November 12, 1891. That bank did not cease to exist when the bank examiner took charge of its affairs on November 12th, nor when the receiver qualified and took possession on December 29th. And the services rendered after that date were rendered to the bank none the less because its business affairs were directed and controlled by a receiver instead of by a board of directors.

5. It is further contended that there should be no recovery for these items of October 13th, because the proof of loss "did not pretend to show any loss on this item. It merely stated that false credits to this amount were given, but did not state that Collins ever drew out the money." The proof of loss sets out several other instances of false entries. As to the items referred to it states:

"That on the 13th and 14th days of October, 1891, said G. N. O'Brien, being the cashier of said bank, and as such cashier having charge and supervision of the books of said bank, made entries of the deposit tags, and caused the same to be entered by a bookkeeper in the books of the bank, of credits in favor of J. W. Collins of the sum of $45,000, without the said Collins paying any consid-

eration therefor to said bank, and without being entitled to said credits, as he, the said O'Brien, then and there well knew."

After reference to other false entries, there follows:

"Affiant further says that neither of the above sums, nor any part thereof, have ever been returned or repaid to said bank."

The objection is hypercritical. The claim imports with reasonable plainness that the sum of $45,000, falsely entered to the credit of Collins, was taken from the bank, for it is expressly stated that it has never been returned or repaid. It is difficult to conceive of a business man of such phenomenal mental obtuseness as to be misled by such a notice into the belief that the assured made no claim to have lost anything by the false entries of October 13th and 14th. Of a clause providing for proofs of loss much more specifically than does the bond in suit it was said in Turley v. Insurance Co., 25 Wend. 375:

"This clause of the contract is to receive a reasonable interpretation. Its intent and substance, as derived from the language used, should be regarded. There is no more reason for claiming a strict literal compliance with its terms than in ordinary contracts. Full legal effect should always be given to it, for the purpose of guarding against fraud or imposition. Beyond this, we would be sacrificing substance to form; following words rather than ideas."

The requirement in the contract in suit calls only for "a written statement of such loss, certified by the duly-authorized officer or representative of the employer, and based upon the accounts of the employer." The statement of loss in evidence is in substantial compliance with this requirement.

6. The plaintiff in error contends that it was error to admit in evidence Collins' ledger account and the teller's book. The teller's book was kept by Gregg, the teller, who died before the trial, but contains entries by others. The only pages in this book which were put in evidence refer to September 22d, on which day it was contended that no money was paid into the bank for certificates of deposit, although on that day certificates were issued to Collins; and to May 2d, on which day it was contended that certificates were issued to Collins in excess of any money paid in for certificates. It was competent evidence, but not conclusive evidence, that money was not paid in, to show that upon the page where such payments should have been entered they did not appear, the course of business having been shown, and the summaries of transactions of each day into which all items entered, and by which the daily balance was struck, being shown to be in the handwriting of the deceased teller. The ledger account of Collins was kept by Brimhall, the bookkeeper. All the entries on both debit and credit sides were made by him, except two, made after the bank suspended, and with which we have no concern, since, as heretofore stated, Collins' ledger balance on that day was only $11,420.90. Brimhall was called to the stand, and testified to the accuracy of all his entries. Those on the credit side were made from deposit tags. These tags were all put in evidence, and, since the plaintiff in error has not printed them,

nor called attention to any of them in argument, it must be presumed that examination of them showed that Brimhall's entries in the ledger agreed with them. Gregg, who acted both as paying and as receiving teller, died before the trial. In the regular course of business he was the one who first received the deposit tags, and, after examining them, and verifying the deposits accompanying them, placed the tags upon a spindle, whence they passed to the bookkeeper. If Gregg were alive, he should have been called to testify that he allowed no tag to pass beyond him without verifying it; and that, if he found it not to conform to the amount of money or checks which it claimed credit for, he corrected it. But, being dead, his evidence was not obtainable, and it is a well-settled rule of evidence that in such cases it will be presumed, in the absence of any evidence to the contrary, that the clerk properly discharged the duties of his office. The spindle puncture in the tags indicated to the bookkeeper that they had passed the teller, and under the application of the rule it must be held that the teller had found them correct, either by finding with them the money or checks they called for, or by seeing upon them, as was the case with the deposit tags of the $44,500 in controversy, the declaration of the cashier that telegraphic dispatches entitled Collins to a credit. All the entries on the debit side of Collins' ledger account down to the day when the bank suspended, were made by Brimhall, the bookkeeper. He testified that he made them all from checks of Collins, which, of course, were subsequently returned to Collins. These checks, when before Brimhall, all bore the teller's stamp, showing that they had been paid by the bank. The bookkeeper had no personal knowledge whether they were paid or not, but the teller had, and the stamp affixed by the latter in the regular course of his business, he being dead, is as competent evidence of their payment as would be his own statement to that effect if he were living and in the witness chair. The authorities cited by the plaintiff in error deal with a very different state of affairs. In all of them the books were offered merely as "books of account," without independent proof of the accuracy of their contents. In the case at bar all the entries admitted from the ledger were proved by the evidence of the individual who made them from the original memoranda, supplemented by proof that such original memoranda were found to be correct, or were correctly made by the very individual who received the deposits, and who paid out the money on the checks. The objection to the admission of the ledger account of Collins on the ground that it was incompetent, and not sufficiently proved, is therefore unsound. And in view of the fact that such account shows that Collins drew out of the bank money amounting in the aggregate to more than stood to his credit on October 12th, plus all deposits subsequent to October 13th, the excess, $33,079.10, coming out of the credits for $44,500 given him October 13th on the false entries of O'Brien, the objection that such account was irrelevant and immaterial is simply frivolous.

7. It is further contended that the court erred in admitting evidence of similar acts of fraud and dishonesty perpetrated by O'Brien prior to the date of the bond. No claim was made against the surety company for any loss sustained by such frauds, but evidence as to them was relevant and material, as tending to show that the transaction of October 13th was not a mere oversight or negligence of O'Brien's, but was an intentional and dishonest act, one of many such, and part of a systematic scheme to divert the funds of the bank in Collins' hands. Continental Ins. Co. v. Insurance Co. of Pennsylvania, 2 C. C. A. 538, 51 Fed. 884. And on the same principle it was relevant and material to show that on October 13th Collins, who had an apparent balance to his credit of over $90,000, was in reality, partly by reason of other false entries and other improper actions of the cashier, a debtor to the bank in a large amount.

8. It was not error to admit the paper Exhibit J 1, which was a statement of the account of Collins, as corrected by the expert accountant, showing that the bank claimed that when it suspended he owed it $374,978.22. This document, which was inclosed in a letter from the receiver to the company, dated July 18, 1892, was sent in answer to a request made by the company in a letter of July 8th that it be furnished with statements on its regular printed forms of the claims against Collins and O'Brien, and also with "full information in regard to the shortages and credits of every kind whatever, whether on account of salary due, money paid, or assignments made by either of said persons to the California National Bank." It was clearly admissible as part of the correspondence, and the only objection made to its admission was on the ground that it was not the original, but a copy. The original was not produced by the defendant, to whom it had been sent, and the accuracy of the copy was sufficiently proved. The question of its weight as evidence, which plaintiff in error has argued here, is a very different one from that of its admissibility. But no such question is presented on this record. Plaintiff in error might have reserved the point by a request to instruct the jury as to what consideration they might properly give to the document; but he made no such request, and has no exception which presents the point.

9. It is further contended that the court erred in refusing to direct a verdict for the defendant on the ground that the bond had been procured by misrepresentation and concealment on the part of the bank. Plaintiff in error also excepted to so much of the charge as instructed the jury that there was nothing to that defense. There was evidence that prior to the execution of the bond O'Brien had, by acts of fraud and dishonesty, assisted Collins in obtaining false credits, and thus getting possession of money which rightfully belonged to the bank. At the time when O'Brien made application for the bond in suit, Collins also made application for a similar bond insuring his (Collins') honesty and fidelity, and obtained one for $25,000. How it came about that

these two bonds were asked for,—whether it was a suggestion of Collins, or whether any by-law or resolution of the board of directors required security to be given,—does not appear. The bond in suit recites that the "employé [O'Brien] * * * has applied to the American Surety Co. for the grant by it of this bond," and defendant put in evidence the application on which it was granted. It is to be assumed, as the trial judge held, that the officers of the defendant relied upon the representations contained in the application. This application, which is filled up on a printed form furnished by the company, contains various statements of O'Brien personally, mainly in answer to questions. On one of its pages there also appears what is described as an "employer's certificate." No such certificate was required as a preliminary to the granting of the bond insuring Collins' fidelity. And there is nothing to show that the bank, or any of its officers except Collins, had any information that a certificate by any one as to the good character of O'Brien was asked for by the surety company as a prerequisite to the issue of its policy of insurance, which does not, on its face, incorporate the application as a condition of the contract nor in any way refer to the same. The so-called "employer's certificate" reads as follows:

"I have read the foregoing declarations and answers made by George N. O'Brien, and believe them to be true. He has been in the employ of this bank during three (3) years, and to the best of my knowledge has always performed his duties in a faithful and satisfactory manner. His accounts were last examined on the 28th day of March, 1891, and found correct in every respect. He is not, to my knowledge, at present in arrears or in default. I know nothing of his habits or antecedents affecting his title to general confidence, or why the bond he applies for should not be granted to him.

"Amount required, $15,000.00. Bond to date from July 1, 1891.

"Dated at San Diego, the 10th day of July, 1891.

"J. W. Collins, Pt. Cal. Nat. Bk.

"On behalf of —— —."

It is contended that the knowledge which Collins had as to O'Brien's dishonesty was the knowledge of the bank, and that his act in signing this certificate constituted a concealment or misrepresentation for which the bank is to be held responsible. Ordinarily, in transactions to which a corporation is a party, the knowledge of its president is imputed to the corporation, upon the theory that it is his duty to communicate such knowledge to the corporation, and that it must be presumed that such duty has been performed, and representations made by an agent in the course of transactions conducted on behalf of a principal and for its benefit are held to be the representations of the principal. There are, however, well-recognized qualifications of these propositions. In The Distilled Spirits, 11 Wall. 367, it was held that the presumption that an agent communicates his knowledge to his principal will not be entertained when it is not the agent's duty to communicate such knowledge, nor when it would be unlawful for him to do so. In Bank v. Cunningham, 24 Pick. 276, it was held that the knowledge of a director is no proof of notice to a bank when he is himself a party to the contract, having an interest therein opposed to that of the corporation. See, also, Davis

Improved Wrought-Iron Wagon-Wheel Co. v. Davis Wrought-Iron Wagon Co., 20 Fed. 701, and cases there cited. That the liability of an innocent principal for the frauds and deceit of his agent causing damage to a third party is restricted to cases where the agent was acting within the scope of his authority has been repeatedly held. So, where a station agent authorized to issue bills of lading for freight received by a railroad company fraudulently combined with another person to issue bills of lading to him, no freight having been received, one who in good faith had advanced money on the faith of such bills was held not entitled to recover against the railroad company. Friedlander v. Railway Co., 130 U. S. 416, 9 Sup. Ct. 570. It is unnecessary to multiply references, for in none of the cases cited on the brief of either side, nor in such as have come to the knowledge of this court in its investigation of the case at bar, are the facts sufficiently analogous to make the citation especially persuasive. It may be well to restate the facts of this case, thus limiting the application of this decision. The president of a national bank concocts a scheme to purloin its funds, and, finding it necessary in order to accomplish his purpose to secure the assistance of the cashier, induces him to enter into the plot. The abstraction of the bank's funds is accomplished by means of false entries on the books (which deceive the bank examiner), by means of the issue of false certificates of deposit, and by the payment of checks of the main conspirator, which are not thereafter charged against him. After these fraudulent practices have gone on for some time, it becomes necessary to file with the bank security for the fidelity of both parties to the scheme. The bank does not select the surety. The two employés, so far as appears, are free to choose whom they please, provided only that the surety be of sufficient ability to respond. Under these circumstances both the dishonest employés individually apply to the same person to become their surety, such person being a company, which in some instances requires a certificate of the good character of the employé to be given by the employer before it will consent to underwrite the honesty of such employé. In some instances it does not require such a certificate. In Collins' case it became his bondsman, with no certificate from any one but himself personally. The giving of certificates of good character of its employés is no part of the ordinary business of a bank. There is nothing to show that the president was ever authorized by the bank or the board of directors to act for the bank in making such a certificate, nor that the bank, either when the surety was applied to or when the bond executed by it was delivered to the bank, was informed that any such certificate was required. The authorities are not favorable to the assumption of any species of executive power by a bank president without direct authorization (Morse, Banks [2d Ed.] p. 143), but there are many acts which the president of a bank may do without express authority of the board of directors; in some cases because usage of the particular bank impliedly authorizes them, in other cases because such acts are fairly within the ordinary routine of his business as president. The making of statements, however, as to the honesty and fidelity of an employé, for the benefit of the employé, and to

enable the latter to obtain a bond insuring his fidelity on the strength of such representations, is no part of the ordinary routine business of a bank president, and there is nothing to show that by any usage of this particular bank such function was committed to its president. We have reached the conclusion, therefore, that plaintiff's right of action on the bond was not lost because its president, Collins, made to the defendant false representations as to the cashier's honesty. When two officers of a corporation have entered into a scheme to purloin the money of the corporation for the benefit of one of them, in pursuance of which scheme it becomes necessary to make false representations to a third person, ostensibly for the bank, but in reality to consummate said scheme, and for the benefit of the conspirators, and not in the line of ordinary routine business of such officers, and without express authority,—the corporation being ignorant of the fraud,—the officers are not, in thus consummating such theft, the agents of the corporation.

10. It is next assigned as error that the court did not charge the jury, as requested by defendant, that, "if O'Brien did what the plaintiff claims, it was a crime." The pleadings raise no such issue, nor was it a question at all necessary for the jury to pass upon. Defendant had insured against "any act of fraud or dishonesty," and whether any act of fraud or dishonesty proved to have been committed by O'Brien was also a criminal act was wholly immaterial. The verdict shows conclusively that upon the evidence they were satisfied that O'Brien had committed acts of fraud and dishonesty. It seems to be the theory of the plaintiff in error that if the jury had been informed that the acts which they found to have been committed were not only fraudulent and dishonest, but also criminal, they would have disagreed, or brought in a verdict for the defendant, presumably from some sentimental aversion to exposing O'Brien to the obloquy of a verdict which should find that he had committed acts which, if proved against him in a criminal prosecution, might subject him to punishment. If this would have been the result of charging as requested, the refusal was not only sound, but exhibited a wise forethought on the part of the trial judge. The case would have been decided, not upon the evidence, which, as the event proves, convinced the jury of O'Brien's fraud and dishonesty, but upon considerations outside of the evidence, and not legitimately before the jury.

The record presents 121 assignments of error. The brief of plaintiff in error presents its argument only upon 27 of them. We have examined the others, and as to them it is sufficient to say that they are either disposed of by what has been already written, or are not of sufficient importance to call for any more extended discussion in this opinion than they received in the brief. The judgment of the circuit court is affirmed.