## CHESAPEAKE & DELAWARE CANAL CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit.   March 31, 1917.)

No. 2118.

1. EVIDENCE ⬅⟹333(7)—ADMISSIBILITY—DOCUMENTARY EVIDENCE.

In an action by the United States to recover dividends on corporate stock owned by it, where in the natural course the dividends would, if paid, have been received in the treasury, books prepared by treasury officials pursuant to statute, showing receipts and disbursements, though not books of original entry, are admissible as public records to show that no payments were received.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1256.]

2. PAYMENT ⬅⟹66(5)—PRESUMPTIONS—PAYMENT.

A delay of over 20 years raises a presumption of the payment of dividends declared on corporate stock, where action is not barred by limitations, and plaintiff, whether the state or an individual, has the burden of rebutting the presumption, which can be done either by evidence of nonpayment or explanation for the delay.

[Ed. Note.—For other cases, see Payment, Cent. Dig. § 188.]

3. PAYMENT ⬅⟹66(5)—DIVIDENDS—ACTIONS TO RECOVER.

In an action by the United States to recover dividends on corporate stock owned by it, declared more than 20 years before action, evidence held sufficient to rebut the presumption of payment.

[Ed. Note.—For other cases, see Payment, Cent. Dig. § 188.]

In Error to the District Court of the United States for the District of Delaware; Edward G. Bradford, Judge.

Action by the United States against the Chesapeake & Delaware Canal Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 223 Fed. 926, —— C. C. A. ——, 206 Fed. 964.

⬅⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Charles Biddle and John G. Johnson, both of Philadelphia, Pa., and Andrew C. Gray, of Wilmington, Del. (Biddle, Paul & Jayne, of Philadelphia, Pa., of counsel), for plaintiff in error.

Charles F. Curley, U. S. Atty., of Wilmington, Del.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. This suit was brought in March, 1912, to recover the amount of 3 dividends asserted by the government to be still unpaid. Upon the first trial the government proved its ownership of stock in the company, the declaration of dividends thereon in 1873, 1875, and 1876, and the fact that payment had been demanded in November, 1911; this in effect comprising all the evidence then offered. A verdict for the plaintiff was directed on the ground that the presumption of payment after 20 years should not be applied against the United States. The judgment was reversed (223 Fed. 926, 139 C. C. A. 406, L. R. A. 1916B, 734), this court holding that in such a suit the presumption did apply even against the sovereign; but, as the presumption was rebuttable, a new venire was awarded. On the second trial, the government offered additional evidence to the following effect:

That 14 dividends had been declared before 1873, and had been paid to the United States; that the company had given due notice of these dividends, the notices themselves and copies of the government's replies being produced by the Treasury, and that no notices of the dividends in question were on file in the department:

That, after the beginning of the suit, a government agent had examined the company's books and papers, and had discovered on its files forged vouchers for these 3 dividends purporting to be signed by an officer of the United States, and had discovered also forged receipts therefor on the dividend receipt books, these facts being explained by a witness, formerly in the company's service, who testified that he had been a party to these forgeries, and that he and the company's treasurer had embezzled a large sum of money during the years in question; the same witness testifying that no notices of these dividends had been sent to the United States, and that no payment thereof had been made by the company before he left the company's service in 1886.

It was also testified by witnesses employed in the Treasury that certain books (produced at the trial) were kept officially in the department, and contained entries relating to public moneys during the period from 1872 to 1914; that in the usual course these books would, or at least should, contain entries relating to money paid into the Treasury from any source whatever, but that no entry of the dividends in question appeared therein. These books were 9 in number (Exhibits 78 to 86), and were labeled "Receipts and Expenditures of the United States" for such and such a year. The volumes contain separate annual statements, printed by the Public Printer, each entitled "Combined Statement of the Receipts and Disbursements (Apparent and Actual) of the United States for the Fiscal Year Ended June 30," etc.; and each is preceded by a letter to the Secretary of the Treasury from

the Chief of the Warrant Division, which declares that the statement contains " * * * the receipts and disbursements of the government by appropriations, exclusive of the principal of the public debt, for the fiscal year ended June 30, * * * exhibiting the various sources of the revenues, the apparent expense of each branch of the service under the several departments, and of each department on account of 'Salaries,' 'Ordinary Expenses,' 'Public Works,' 'Miscellaneous,' and 'Unusual and Extraordinary'; and the actual expenses of the same and the *actual* revenues, by deduction from them of those items which appear in both accounts by requirements of law, but which are not *actual revenues* or *true expenditures,* and other items on account of branches of the service intended to be self-supporting, the expenses and revenues of which must by law enter to the account of the Treasury"—these statements being officially forwarded by the secretary to the chairman of the appropriations committee of the House of Representatives.

Four other books were offered (Exhibits 87–90), each labeled:

"Register of Revenue Covering Warrants
"Miscellaneous
"Secretary of the Treasury
"Warrant Division"

—and these were identified as the original registers for 1872 to 1878, inclusive.

One other volume (Exhibit 91), labeled:

"Receipts of the United States
"1791–
"Register's Office, Treasury Department"

—was identified as containing a record of all the government's miscellaneous receipts from 1791 to date, this being the class of receipts in which dividends on stock owned by the United States would appear.

Of these 14 volumes, Nos. 87–90 are originals, and the other 10 are compilations of receipts and expenditures, but all of them are official books kept in the department, and purport to contain records of all the money from every source that had been covered into the Treasury. They contain entries of the 14 dividends paid by the Canal Company before 1873, but contain no entry of the dividends in dispute.

The defendant offered no evidence, and the court submitted the question whether on the plaintiff's showing the presumption of payment had been rebutted, and whether the company had in fact paid the sums sued for. The verdict was in favor of the government, and the company assigns for error the admission of certain evidence, and the giving of certain instructions. The evidence complained of is the 10 books already referred to, and in order to understand the situation clearly it will be desirable to state more fully the method by which the dividends in question should have reached the Treasury in the usual course of events.

[1] Normally, this would have happened: After a dividend had been declared, a notice thereof would have been sent to the Treasury by the

company, stating that the amount due was subject to the government's order, either by draft, or otherwise. The Secretary would then have drawn at sight upon the company's treasurer, and the draft would have been sent for collection to the Assistant Treasurer of the United States in Philadelphia, the company probably being notified that the draft had been forwarded. Thereupon the draft would have been presented, and would have been paid either in cash or by check. The Assistant Treasurer would then have issued two certificates of deposit, specifying that he had received this particular payment from the company, and would have transmitted these certificates to the Treasury, at the same time charging himself therewith in his own daily account of receipts. The other party to this account is the Treasurer of the United States, all public moneys being subject to his draft, and for this reason the dividend would have been deposited to the Treasurer's credit, and the Assistant Treasurer would have reported it to Washington as money received by him in account with the Treasurer. After the certificates of deposit and the Assistant Treasurer's daily transcript of account had reached Washington, they would have been examined and checked to see that they agreed, and the certificates would then have been made the basis of a deposit list, the list being prepared by the Division of Public Moneys and passed to the division then known as the Division of Warrants, Estimates, and Appropriations—afterwards, the Division of Bookkeeping and Warrants. After this division had received the list containing the items fully set out in the certificates, a warrant would have been prepared formally covering the money into the Treasury, thereby charging the Treasurer of the United States, and fixing his accountability therefor. This covering warrant would have been registered in the Division of Warrants, Estimates, and Appropriations; and would have been passed over to the Division of Public Moneys so that the number and date of the warrant might there be noted. Moreover, the covering warrant (signed by the Secretary of the Treasury) would have been passed to the Comptroller of the Treasury, who is required by law to keep a duplicate set of books in reference to these matters. The Comptroller would have countersigned the warrant, and passed it in turn to the Treasurer of the United States, who would have acknowledged thereon the receipt of the particular money described therein. At the end of the quarter the Treasurer would have submitted to the Auditor of the Treasury an account of the moneys received by him during the quarter, and of his disbursements during the same period. These accounts of the Treasurer are in book form, and are examined and settled by the Auditor, who certifies the balance due by the Treasurer to the United States, charging him with the covering warrants issued by the Secretary of the Treasury, and crediting him with all payments made upon warrants drawn on him by the Secretary. The books of the Department show that drafts were drawn for 13 of the 14 dividends referred to, and were paid to the Assistant Treasurer at Philadelphia, reaching the Treasury in the manner described. No draft was drawn for the 14th (the dividend of 1866), but this was deposited directly with the Assistant Treasurer in Philadelphia by the company's treasurer.

The course of accounting just described is commanded by the federal statutes. Exhibit 91 was compiled from Exhibits 78 to 86, which, as already stated, are combined statements of receipts and disbursements by the Treasurer of the United States, made up in the Division of Bookkeeping and Warrants and sent to the Secretary of the Treasury. The 14 dividends referred to were all paid in Philadelphia and were entered on the books of the Subtreasury in that city. The 10 exhibits now under consideration are not books of original entry in the ordinary sense of that phrase; except in part, they had not been prepared by the witnesses that testified about them, and they were not certified as copies of original documents. It was further testified that all the exhibits had been thoroughly examined, but that no entry had been found therein of any of the dividends in question, although such dividends should have appeared if they had been paid.

This is the evidence that was offered to rebut the presumption of payment, the government relying on the testimony of the company's guilty employé, on the absence of entries in the Treasury's books, and on the evidence concerning the earlier dividends.

1. We shall not discuss at length the question whether the 10 exhibits complained of were admissible evidence. They did not need to be certified; they were not copies, but were themselves the records kept in the Treasury, and their authenticity is not denied. In our opinion, they were competent evidence. We understand the general rule to be that when a public officer is required, either by statute or by the nature of his duty, to keep records of transactions occurring in the course of his public service, the records thus made, either by the officer himself or under his supervision, are ordinarily admissible, although the entries have not been testified to by the person who actually made them, and although he has therefore not been offered for cross-examination. As such records are usually made by persons having no motive to suppress or distort the truth or to manufacture evidence, and, moreover, are made in the discharge of a public duty, and almost always under the sanction of an official oath, they form a well-established exception to the rule excluding hearsay, and, while not conclusive, are prima facie evidence of relevant facts. The exception rests in part on the presumption that a public officer charged with a particular duty has performed it properly. As the records concern public affairs, and do not affect the private interest of the officer, they are not tainted by the suspicion of private advantage. There are many decisions in which the general subject is discussed, and some of them may be found in the note to section 332, on page 1125, of 10 Ruling Case Law, and in the notes to paragraph 5a on page 306 of 17 Cyc. See, also, Evanston v. Gunn, 99 U. S. 660, 25 L. Ed. 306; White v. U. S., 164 U. S. 102, 17 Sup. Ct. 38, 41 L. Ed. 365; 5 Chamberlayne, Evid. § 3424 et seq.; 3 Wigmore, Evid. § 1630 et seq.; and 17 Cyc. 306, § 5; Bank v. Brown, 53 L. R. A. 523, note.

And the reasons just stated make such official records competent evidence to prove also the absence of entries that in the usual course should appear therein. U. S. v. Teschmaker, 63 U. S. (22 How.)

405, 16 L. Ed. 353; Amer. Surety Co. v. Pauly, 72 Fed. 470, 18 C. C. A. 644; 3 Wig. § 1633 (6) p. 1982; 3 Chamberlayne, § 1757.

[2, 3] 2. The more important question raised on this writ is whether the government's evidence was sufficient to rebut the presumption of payment arising from the lapse of time. In effect, the defendant contends that a verdict in its favor should have been directed, and it will be sufficient to consider the question from that point of view. What then was the government's situation? For more than 30 years no demand had been made for the dividends in suit, and therefore the government was met by the well-established rule that presumptively payment had been made, and was obliged to prove that this presumption, or inference of fact, was not true. In other words, the burden of proof had shifted, and the government could no longer content itself with proving its right of action—that is, the mere declaration of a dividend—and with leaving the defendant to prove that payment had been made. The government was now compelled to prove a negative—that is, that payment had not been made—its less favorable position being due to the well-settled and excellent rule of public policy that punishes a plaintiff for excessive delay in asserting his right.

But such a delay is not necessarily fatal; it only makes a plaintiff's task more difficult. If he can produce sufficient evidence of nonpayment, he fulfills the requirements of the law, for this exactly meets the challenge of the presumption and overthrows it. We do not agree that before the government could be allowed to prove the fact of nonpayment it was bound, as a separate obligation, to explain or excuse the delay. It is possible that the language used in some discussions of the subject will bear this construction; but, even if this be true, we do not find the point squarely decided, and in any event we are unable to see that the reason of the rule puts such an obligation on a delinquent creditor. And, even if we assume that a private suitor might be obliged to explain or excuse his prolonged failure to sue, this merely requires him to account for his laches or negligence, and, as the sovereign is not bound by the laches of his agents, he cannot be compelled to explain a neglect that he may wholly disregard. But in the case of a private suitor also we think the defendant's contention is not sound. Loose expressions may have been sometimes used on this subject; but, if the presumption and the reasons of policy that sustain it be closely considered, we think it will appear that after 20 years the issue between the parties continues to be what it was before, namely, Has the particular debt been paid? When the statute of limitations is interposed as a defense, the question of payment becomes of no importance; the plaintiff cannot recover, although it may be certain that he has not been paid; but where the statute does not apply—and it does not in the present case—the issue of payment is the vital matter. Ordinarily a plaintiff need do no more than prove the existence of his claim, whereupon the defendant must prove payment. But, if it appears from the evidence that the debt is of long standing, the plaintiff's task becomes progressively difficult, for the inference of payment may then be readily drawn from other circumstances; and, if the delay has lasted for 20 years, a definite presumption arises that

is often the practical equivalent of the statute. Legally, however, it is not the equivalent; if he can, the plaintiff may always prove that he has not been paid, but his delay has somewhat changed the character of his task, and forces him to show reasons why the failure to sue should not be a bar. These reasons may appear to be merely explanations or excuses, and may be so described without inaccuracy, but we think it equally accurate to say that they are really part of the evidence that tends by inference to show nonpayment. For example, a dilatory plaintiff often proves the defendant's insolvency; this may be correctly spoken of as an excuse for delay, but just as truly it is a fact tending to show that the debtor has not paid because he could not pay. So, the absence of the debtor from the jurisdiction; this tends to show that he has not paid because he could not have been sued, and thus compelled to pay. So, also, the near relationship between the parties; this tends to show nonpayment, because it furnishes a reason why the plaintiff did not ask for the debt, or did not urge its payment. As it seems to us, such matters as these become part of the plaintiff's task, but they are not conditions precedent to success. In the end, all he is bound to prove is nonpayment, and in fulfilling that obligation explanations or excuses are merely steps in the proof.

The defendant cites the following cases in support of its contention: Bowman v. Wathen, 42 U. S. (1 How.) 189, 11 L. Ed. 97; Wagner v. Baird, 48 U. S. (7 How.) 234, 12 L. Ed. 681; Philippi v. Philippe, 115 U. S. 151, 5 Sup. Ct. 1181, 29 L. Ed. 336; Hillary v. Waller, 12 Vesey, Jr., 239; Cope v. Humphreys, 14 Serg. & R. (Pa.) 15; Foulk v. Brown, 2 Watts (Pa.) 215; Sellers v. Holman, 20 Pa. 321; Miller v. Overseers, 17 Pa. Super. Ct. 159; Holway v. Sanborn, 145 Wis. 151, 130 N. W. 95; Stover v. Duren, 3 Strob. (S. C.) 448, 51 Am. Dec. 634. Among these we quote from Sellers v. Holman what is probably a typical statement of the rule:

"Those rules which give repose to society and forbid the assertion of stale claims, after the evidence of their discharge has been lost, are everywhere much more highly appreciated by the courts now than they were once. It has, however, not been decided in any case, ancient or modern, that a mere demand, without more, is enough to repel the presumption, and in one, at least (1 Ves. & Be, 536), the contrary was held. * * *

"That a specialty or debt of record is paid after 20 years from the time it became due is a presumption of law which the courts must enforce without inquiring whether it be according to the truth or not. The law has given to this lapse of time a fictitious value, equal to direct proof of payment. But the evidence of nonpayment, by which the presumption is to be repelled, has no force, except what it derives from its intrinsic power to produce conviction on the mind. A circumstance, therefore, which does not actually disprove the payment, nor satisfactorily account for the delay, is entitled to no weight. The presumption of payment is raised by an artificial rule. It cannot be rebutted, except by evidence which will create a natural presumption, at least equally strong."

In Coleman v. Erie Trust Co., 255 Pa. 63, 99 Atl. 217, the most recent case decided by the same court, it is said:

"The presumption of payment arising from lapse of time is not conclusive, but is merely a presumption of fact which is rebuttable. The presumption is rebutted, or, to speak more accurately, does not arise, when there is affirmative proof * * * that the debt has not been paid, or where there are cir-

cumstances that sufficiently account for the delay of the creditor.' Reed v. Reed, 46 Pa. 239, 242. Further on in the same opinion Mr. Justice Strong said that presumption from lapse of time 'is only an inference that the debtor has done something to discharge the debt, to wit, that he has made payment. Hence it is rebutted by simple proof that payment has not been made. And, the facts being established, whether they are sufficient to rebut it is a question for the court, and not for the jury.' In this instance there was affirmative proof that the judgment had not been paid, in the positive testimony of the plaintiff to that effect. The facts were not in dispute, and it was therefore for the court to say whether or not the judgment was a valid claim. In addition to the affirmative proof that the debt had not been paid, the circumstances shown were such as to reasonably account for the delay. It appeared that the debtor was for years in straitened financial circumstances, and had but a small income, which would have been seriously disturbed had payment of the judgment been pressed. The relationship of father and son between the defendant and plaintiff was also a sufficient and natural reason for the delay of the latter in enforcing payment."

The company concedes, as it must, that the presumption is rebuttable, and we do not see how it can be repelled except by such evidence as is, no doubt, sometimes called "explanations for delay." And in this connection we think it should be remembered that the rule grew up and took shape while parties themselves were not permitted to testify. Direct evidence, therefore, either of payment or of nonpayment, was not easy to obtain, and the parties were driven to such indirect evidence as would support the inference of one fact or the other. Even now, when parties are, in general, competent witnesses, a living party, if his antagonist be dead, cannot testify to facts that occurred in the decedent's lifetime. So that the result is this: If both parties be alive, and if oath be opposed to oath, the case can hardly be decided except by the indirect evidence, whatever name this may bear; if only one party be living, the indirect evidence is usually all that can be offered.

Of course a mere demand by the creditor after 20 years adds no strength to his case, and the courts have not attempted to lay down with precision how much evidence is necessary before the question of payment should be submitted to a jury. In this respect every case must stand on its own footing, and concerning the present record we shall say nothing more except that a careful study has satisfied us, not only that the trial judge could not properly have directed a verdict for the company, but also that the evidence carries clear conviction that the dividends in question have never been paid. That the money was stolen by the company's trusted servants is its grievous misfortune, but this is undoubtedly the fact, and the loss must rest where it has fallen.

We see no need to discuss the assignments of error in detail; no reversible error was committed in the conduct of the trial, and the judgment must therefore be affirmed.