GRACE et al. v. BROWNE et al.

(Circuit Court of Appeals, Second Circuit. March 2, 1898.)

No. 81.

1. SHIPPING—CARRIAGE OF GOODS—DATE OF SAILING.

A cargo of nitrate of soda having been purchased to be shipped on a sailing vessel to sail in November, the purchaser refused to receive it, on the ground that the ship did not sail in November. The proofs showed that on November 29th, after loading, the vessel broke moorings, took a pilot, and went to a place known as the "starting ground," but did not actually depart until December 1st. There was a conflict of evidence as to whether the master intended to depart on the 29th, and was prevented by lack of wind. *Held,* that the issue was properly submitted to the jury.

2. EVIDENCE—SHIP'S PAPERS.

An application by a vice consul for a permit for the vessel to depart, a bill of lading signed by the captain, a license to sail, a certificate of the customhouse official that the vessel had paid its tax for hospital dues, and the bill of health signed by the maritime subdelegate; the bill of lading being identified by the mate, and the other papers being official documents under seal, executed by the Chilian authorities, and such as the laws of maritime nations generally require, and produced by the proper custodian from the proper place of custody,—are entitled to confidence, and should be admitted as evidence.

In Error to the Circuit Court of the United States for the Southern District of New York.

On October 30, 1894, Hemenway & Browne, hereafter called "the plaintiffs," sold to William R. Grace & Co., hereinafter called "the defendants," 3,000 bags of nitrate of soda, to be shipped in a sailing vessel to sail in November, 1894, from the western coast of South America to New York. The complainants alleged that this quantity of nitrate was duly shipped from Taltal, Chili, on the west coast of South America, in the Beechdale, a British sailing vessel, which sailed during the month of November, and arrived in New York on March 29th, when the defendants refused to receive any of it, upon the ground that the vessel had not sailed from Taltal until December 1, 1894; that the price of nitrate had fallen; and that the damages to the plaintiffs therefrom were $2,988.10. These allegations were admitted, except that it was denied that the vessel sailed during the month of November. The case was tried to the jury upon the question of the date of sailing, and the verdict was for the plaintiffs. The vessel reached Taltal on October 26th, and finished loading on November 29th, about 6 o'clock p. m. Taltal is a small bight on the open coast, has no docks, and vessels are loaded from lighters. The vessel broke moorings, took a pilot, hove anchor, and was taken to what is called the "starting ground," at the outside harbor limit, on the evening of November 29th, but did not actually depart to sea until December 1st. The two alleged errors which are relied upon by the defendants are the refusal of the trial court to direct a verdict in their favor, and the admission of the clearance papers of the vessel, which will be hereafter described, without further authentication. There is no disagreement between court and counsel as to the terms of the contract, or as to what constituted a sailing. The circuit judge charged the jury that the question whether the vessel sailed on November 30th or December 1st was not technical; that the parties had, by their contract, made a November sailing a matter of substance; and that performance of the contract was necessary to a recovery. He further charged that "a vessel sails from a port when she breaks her moorings, being fully prepared to go to sea, with the intention of immediately proceeding to sea, and is only delayed by some accidental circumstance"; and that "a vessel sails when she weighs anchor, or casts off or gets under way with the intention to proceed at once to sea without further delay; but, if she is not entirely ready for sailing, she has not sailed by merely moving down the harbor." The court further charged that three

requisites must be shown by the plaintiffs,—a condition of preparation or readiness, some action taken, and an intention to sail on November 30th. No objection was made to the terms of the charge, but the defendants are of opinion that under this conceded state of the law there was no question of fact to be submitted to the jury. The captain of the Beechdale died on the homeward voyage, and the question as to the time of sailing depended very much upon the value which should be given to the mate's testimony, which was that the pilot left the vessel on the evening of November 29th outside of the harbor limit; that there was no wind on the 30th, and the vessel was weighed out about half a mile further, in the hope of getting wind when she was in the open sea in about 45 or 50 fathoms of water; and that the failure to continue the voyage was the lack of wind, and that the witness was on the watch, looking for a breeze. The clearance papers were introduced to show a readiness for sea.

Wm. L. Turner, for plaintiffs in error.
Wm. M. Ivins, for defendants in error.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts). The point in dispute was the intention with which their action was undertaken on the 30th, for the court abundantly charged that the intention of the captain was an essential element to be affirmatively proved. There was room from the mate's testimony for the inference that the vessel left her moorings, and was at the edge of the harbor, for the purpose of getting ready to depart, but not with the intent of instantaneous sailing, and that the action which was taken was simply to put the vessel in readiness to go when the captain was ready to quit the port, and that the theory of her moving seaward with the intent of a forthwith departure was fictitious. But the question could not properly be taken from the jury. There was too much affirmative testimony on the part of the plaintiffs for a court to declare that there was no question of fact in actual controversy.

The next question is in regard to the inadmissibility of the clearance papers without additional proof of the official character and signature of the officers who executed them. They were found, after the captain's death, with the other ship's documents, and consisted of six papers. The first was the ship's manifest, with the crew list, signed by the captain, with a certificate by the British vice consul of the examination of the sailing letter, and the return of the ship's articles, on November 29th, and with a certificate of the captain of the port, dated November 29th, that the vessel arrived in Taltal on October 25th and departed November 29th, "the clearance having been presented, executed by competent Chilian authorities." This paper was admitted without objection. The other papers were: (1) An application by the British vice consul to the Chilian authorities on November 29th for a permit for the vessel's departure. (2) The bill of lading, dated November 30th, and signed by the captain, and both bill and signature identified by the mate. (3) The license to sail, which consisted of the application of the shippers to the governor of the port for a sailing license; the certificate of the governor granting license after payment of charges; the certificate of the custom-house official that there are no charges; and the permit of the maritime subdelegate

of the port granting leave to weigh anchor. All these papers were dated November 30th. (4) A certificate of the custom-house official that the vessel had paid its tax for hospital dues, dated November 30th. And (5) the bill of health, signed by the maritime subdelegate of the port on November 30th, at 11:30 a. m. All these official documents were under seal. The certificates of the notary and of the governor of the port to the signature of the notary, and the certificate of the British vice consul to the signature of the governor upon the bill of health, were dated on December 1st, and this fact was one of the main points of the defense as indicating that the vessel was not ready to sail on November 30th. The reply to this argument was that these attestations were not necessary, but were probably taken out of abundant caution, as the vessel was obliged to delay. The bill of lading was sufficiently identified by the testimony of the mate. The other papers which were of value were not copies, but were original documents, executed by the Chilian authorities, who were public agents appointed for the purpose of protection to foreign commerce, to furnish the documentary evidence that vessels are engaged in regular traffic, and that they have permission to sail, which the laws of maritime nations generally require, and which must be furnished by foreign vessels when they arrive in this country. Rev. St. § 4209. They were produced by the proper custodian from the proper place of custody, and that they were the clearance papers intended for use upon that voyage was manifest. These documents are of a public nature, which are made by persons specially appointed for that purpose, in discharge of a public duty, are entitled to confidence on that account, and their admissibility stands upon the same ground with that of official registers, in regard to which it is said by Professor Greenleaf (1 Greenl. Ev. § 483):

"These documents, as well as all others of a public nature, are generally admissible in evidence, notwithstanding their authenticity is not confirmed by those usual and ordinary tests of truth, the obligation of an oath and the power of cross-examining the persons on whose authority the truth of the documents depends. The extraordinary degree of confidence, it has been remarked, which is reposed in such documents, is founded principally upon the circumstance that they have been made by authorized and accredited agents, appointed for the purpose; but partly, also, on the publicity of their subject-matter. Where the particular facts are inquired into, and recorded for the benefit of the public, those who are empowered to act in making such investigations and memorials are in fact the agents of all individuals who compose the state; and every member of the community may be supposed to be privy to the investigation. On the ground, therefore, of the credit due to agents so empowered, and of the public nature of the facts themselves, such documents are entitled to an extraordinary degree of confidence; and it is not necessary that they should be confirmed and sanctioned by the ordinary tests of truth. Besides this, it would always be difficult, and often impossible, to prove facts of a public nature by means of actual witnesses upon oath."

It is true that they are foreign official documents, but, because the laws of maritime countries universally require the issuance of that general class of documents, and the statutes of this country require them to be taken by the master of a foreign vessel if he is destined for a port in this country, and compel their production to

the collector of the port where he makes entry of his vessel, they stand, in regard to admissibility, upon the same footing with other original official documents. 2 Tayl. Ev. §§ 1431–1434. The judgment of the circuit court is affirmed, with costs of this court.