BACON v. CONROY.

(Circuit Court of Appeals, Second Circuit. June 15, 1909.)

No. 272.

1. ADMIRALTY (§ 73*)—DOCUMENTARY EVIDENCE—SHIP'S LOG.

It is the better practice to introduce the log of a vessel in evidence, after being duly authenticated, to prove facts stated therein, rather than to rely on the testimony of the officer who made the entries after reading the same, when much time has elapsed, and the facts are of such a character, that he cannot be supposed to have any independent recollection of them.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 73.*]

2. SHIPPING (§ 153*)—ACTION TO RECOVER FREIGHT—SUFFICIENCY OF EVIDENCE.

Evidence *held* sufficient to sustain a finding that the weight of a cargo of chalk carried by a vessel was in excess of that reported by the consignee and on which freight was paid.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 153.*]

Appeal from the District Court of the United States for the Southern District of New York.

Wing, Putnam & Burlingham (James Forrester, of counsel), for appellant.

Wheeler, Cortis & Haight (John W. Griffin, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. The libelant chartered the steamer Fortuna to the respondent's testator to carry a cargo of block chalk from Dunkirk to Philadelphia. The bill of lading though calling for 4,300 tons contained the clause "weight unknown." On arrival the cargo was discharged in tubs and removed by the consignee to some point in the city of Philadelphia where it was weighed. Freight was paid on 3,725 tons. Some six months afterwards this libel was filed, claiming freight on 275 tons in addition.

Several methods are pursued to show that the actual weight of the cargo delivered was not less than 4,000 tons. First, two sizes of tubs

were used, one weighing 1,600 and the other 800 pounds when loaded. The only witness who gives the figures of the tally is the captain, who, reading them from a letter signed by him, the chief officer, and the chief engineer, date not stated nor person addressed, says 5,685 of the large and 572 of the small tubs were discharged. The theory was that the master refreshed his recollection by looking at this letter; but he is not shown to have had any personal knowledge of the tally at all.

The trouble with this calculation is that there is no legal proof of the tally. It was kept from August 26th, the day of arrival, to September 1st, by the second mate at one end of the vessel and the boatswain at the other, and from September 1st to September 9th by a new second mate and the boatswain. The only one of these men produced as a witness, who had personal knowledge, is the original second mate, who tallied at one end of the ship between August 6th and September 1st.

No explanation is offered why the master, having these facts and figures within reach, did not at the time of discharge, when witnesses were at hand and recollection fresh, raise the question whether the amount of freight paid by the consignee was correct. This is the time when such questions should be settled.

The next method is to compare the draft of the vessel at the time of arrival, 22 feet 3 inches, with her loading or displacement scale, deducting other weights than the cargo contained in her. These consisted of boiler water, fresh water, coal, and stores. Allowing for weights other than cargo and for the difference between the specific gravity of the water at Philadelphia and water at sea, the vessel should have had on board according to her loading scale, the accuracy of which was proved by the chief engineer Iverson, cargo weighing over 4,000 tons. The foregoing calculation is corroborated by comparing the weights on board after the discharge of the cargo with the loading scale at the then draft of 11 feet.

The chief engineer testifies that entries in the engineer's log made by him as to the weights of the coal, fresh water, boiler water, and stores on arrival and of the same articles together with the water ballast after discharge of the cargo were to his knowledge correct at the time they were made. The theory was that by looking at the log he refreshed his recollection; but this was evidently not so. He had after looking at the log no revived or independent recollection, but could only say that he knew the entries when made were correct. The log was only marked for identification. We think it would have been better practice to offer the entries in evidence. Howard v. McDonough, 77 N. Y. 592; National Ulster County Bank v. Madden, 114 N. Y. 281, 21 N. E. 408, 11 Am. St. Rep. 633.

While the proof is not of a very satisfactory character, we think the district judge was justified in finding that a prima facie delivery of at least 4,000 tons of chalk was made out, especially in view of the fact that the respondent offered no evidence whatever as to the actual weight of the cargo at Philadelphia if it was weighed, or how

the freight was estimated if the cargo was not weighed, or that it was not within his power to make such proof.

The decree is affirmed, without interest or costs.

NOTE.—The following is the opinion of Adams, District Judge, in the court below:

ADAMS, District Judge. This was an action to recover a balance of freight alleged to be due under a charter party of the steamship Fortuna, dated July 26, 1905, between the libellant and respondent's firm of John D. McGlincey & Company. Under this charter, the steamer was to transport a cargo of block chalk, not exceeding 4,300 tons from Dunkirk, France, to Philadelphia, at the rate of 7 shillings and 9 pence per ton of 2.240 pounds, captain to sign bills of lading as presented. Pursuant to the contract, a cargo was duly loaded at Dunkirk and delivered to the consignees in Philadelphia. The captain signed bills of lading therefor, as ordered by the charterers. The cargo was delivered in conformity with the bills of lading. It is alleged that freight was duly paid on 3,725 tons, leaving a balance of 275 tons, upon which freight should be paid, but is refused.

The pleaded defense is a denial that the cargo amounted to 4,000 tons and the libellant was left to make such proof as he could of the quantity on board.

The case was not tried in court. The depositions of the master, the chief engineer and the mate were taken, however, and produced. I have read them carefully. Their testimony was objected to because the witnesses, particularly the master, used the ship's logs in giving it, but it appears they were not testifying from the logs, but from their memories as refreshed by them and these objections should therefore be overruled.

The master's testimony showed that he signed bills of lading for 4,200 tons, but the statement of the amount was coupled with an acknowledgment that he signed "weight unknown" and he said he did not in fact know what the weights were. The libellant claims that the bill of lading amount was checked by the ship's tally when loading, but the only evidence of this was the master's statement, that "the mate always takes the number of the cars in loading," which obviously is of no value when the sufficiency of legal evidence is questioned.

It was attempted to establish the weights from the draft of the ship. That involved giving reasonably accurate computations of the weights of coal, water, fresh and boiler, and stores on board before and after discharge. The weight of the coal was established by the testimony of the engineer. Some calculations have been made of the weights of the cargo in connection with what is called the "Builders' scale." That was objected to as not being properly proved and not competent. When it was introduced the first objection was good, but the subsequent testimony of the chief engineer established its correctness and I think it then became competent. The draft of the steamer at sea before discharge was 22 feet, 3 inches, from which should be deducted 3 inches for the fresh water she was in at Philadelphia. By the builders' scale it appears that a load of 4,350 tons is required to give the ship a mean draft of 22 feet. When she was at that draft, she had on board 209 tons of weight other than cargo, which was therefore 4,141 tons, corresponding, substantially, with the bill of lading weight. The testimony shows that the weights of the items of cargo were as follows:

| | Before discharge tons. | After discharge tons. |
|---|---|---|
| Coal | 143 | 262 |
| Fresh Water | 12 | 10 |
| Boiler water | 38 | 38 |
| Stores, lumber | 16 | 16 |
| Water ballast | ... | 493 |
| | 209 | 819 |

The exact weight of cargo does not appear, but there is sufficient to show that a greater quantity was on board than paid for and more than the claim here.

No evidence of any kind has been offered by the respondent, nor has any oral argument or brief been submitted by him, or assistance of any kind been given by him to the court, which has been left to ascertain the facts as best it could from the proofs submitted by the libellant, aided by his able brief. I think in the absence of any contradiction of the libellant's proofs, the court is required to deduce from them that the weight of the cargo was at least 4.000 tons. As the respondent has paid for 3,725 tons, a balance remains of 295 tons, which at the charter rate makes, with the exchange at $4.86, $517.59, for which amount, with interest, the libellant should have a decree.