**KINGS COUNTY LIGHTING CO. v. NIXON, Public Service Commission of New York, et al.**

(District Court, S. D. New York. October 13, 1920.)

1. **Evidence 383(8)—Books of gas company, kept as required, are prima facie "evidence" of expenses.**

   Though "evidence" has been variously defined, and is a relative term, it always contains the element of the relation between a proposition to be established and material to establish the proposition; and books of account kept by a gas company in the manner required by the Public Service Commission, for the purpose of enabling the commission to keep watch of the public utilities of the state, would be the first source for information as to the cost of making the gas, and are prima facie evidence of such expenses on behalf of a gas company, as well as when used against it.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Evidence.]

2. **Gas 14(1)—Eighteen months' operation at loss sufficient to entitle company to relief.**

   Even if a period of 18 months, when conditions were abnormal, was insufficient experience on which to fix a reasonable rate, it is sufficient to show that the existing rate was confiscatory, where the gas plant was operated at a loss during the entire period, since, even if the gas company should have temporarily operated at a loss during readjustment periods, the 18 months was a reasonable time for such operation.

3. **Courts ☞99(1)—Question considered by three judges, granting temporary injunction, not reconsidered.**

While the decision of three judges in granting a temporary injunction is only a District Court decision, not binding on the judge who hears the case finally, the decision of those judges on a contention presented to them, which was not affected by the cross-examination of the witnesses, or by additional evidence at the final hearing, will not be disturbed.

4. **Gas ☞14(1)—Noncompliance with statutory requirement, because of necessity, does not defeat right to injunction.**

A manufacturer of gas is not deprived of his right to an injunction against a statutory rate, which compelled him to operate at a loss, by his failure to comply with the statutory requirement as to the quality of the gas, which requirement might itself have been held confiscatory under the conditions.

5. **Judgment ☞828(3)—Finding gas rate not confiscatory by state court not conclusive under changed conditions.**

A judgment of a state court, finding a statutory rate. for gas not confiscatory under conditions existing before that suit, is not conclusive that the same rate is not confiscatory under changed conditions existing thereafter.

6. **Gas ☞14(1)—City not necessary party to suit to enjoin statutory gas rate.**

A city in which a gas company is operating is not a necessary party to a suit by that company against the Public Service Commission and others to restrain the enforcement of the statutory rate for gas.

7. **Stipulations ☞18(1)—Master's findings of value in excess of stipulation improper.**

Where the parties to a suit to restrain the inforcement of a statutory rate for gas stipulated as to the value of the gas company's plant for the purposes of that suit, a finding by the master, adding to the stipulated value an additional value for necessary improvements, was improper.

8. **Gas ☞14(1)—Where statutory rate fails to pay expenses, holding as to fair return is immaterial.**

In a suit to restrain the enforcement of a statutory rate for gas, where it was shown that the cost of making the gas exceeded the rate, a holding as to the return to which the company was entitled on its capital was immaterial.

9. **Gas ☞14(1)—Courts cannot make rates.**

Courts cannot make rates for charges; their only power being to pass upon rates after they are made.

10. **Stipulations ☞18(1)—Stipulation held not to preclude evidence subsequent to decree.**

Where the parties to a suit to restrain the enforcement of a statutory rate for gas stipulated that for the purpose of that litigation the gas company had an investment of a stated value, either party dissatisfied with that stipulation or the legal effect thereof after the decree may, in proper proceedings, seek and obtain opportunity to present evidence as to value.

11. **Gas ☞14(1)—Company held entitled to credit for 15 per cent. of unaccounted-for gas.**

A gas company operating within the legal boundaries of a large city, but in fact supplying numerous small consumers through long mains in sandy soil, where the amount of metering was excessive, is in reality operating in a country town, and is entitled to 15 per cent. of unaccounted-for gas, which experience shows common in towns of that character.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Gas ⊙⊐14(1)—Evidence held to sustain item for repairs.**

In a suit to restrain the enforcement of a statutory gas rate, evidence that any gas-making company is entitled to take in its meters for repair after they have been in service for five years, is sufficient to sustain the master's allowance of an item of repair which does not exceed the expenditure thereby required.

**13. Gas ⊙⊐14(1)—Increased cost of gas oil does not require change to coal gas plant.**

The fact that the cost of oil for the manufacture of gas has been increased by the demands for oil and gasoline, so as to make the cost of the gas exceed the statutory rate, does not require the gas company to manufacture gas from coal, for which it possessed no equipment, before seeking to enjoin the enforcement of the rate.

In Equity. Suit by the Kings County Lighting Company against Lewis Nixon, constituting the Public Service Commission of the State of New York, and others. On exceptions by plaintiff, by the Public Service Commission, and by the Attorney General of the State of New York to the report of the special master. Report modified and confirmed, and decree entered awarding injunction to plaintiff.

Samuel F. Moran, of New York City (George L. Ingraham, of New York City, on the brief), for plaintiff.

Wilbur W. Chambers, Deputy Atty. Gen., and Terence Farley and William S. Jackson, both of New York City, for defendants.

HOUGH, Circuit Judge. In view of the nature of this case, all the evidence submitted to the master has been read and considered, to the end that the exceptions filed might be disposed of after an independent review of the record, even as to matters of fact. It does not, however, appear necessary to make new findings, as the exceptions argued refer to those made by the master.

### Defendants' Exceptions.

These exceptions extend substantially to every proposition found either in the master's report or opinion. Yet they may be grouped with sufficient accuracy under the following heads:

(1) Plaintiff has sought to support its case almost wholly by incompetent evidence, viz. its own books.

(2) The period from January 1, 1919, to June 30, 1920, is too short a time upon which to base any finding of the nature of a statutory gas rate.

(3) Plaintiff is prevented by the accepted rules of equity from advancing the contention here made, because it has during all or most of the year and a half above referred to persistently and deliberately disregarded the statutory rule that the gas produced by it must be of "22 candle power."

(4) Plaintiff is barred from prosecuting this action by a judgment entered March 29, 1920, in the Supreme Court of New York, wherein relief similar to that now demanded was sought.

(5) The city of New York is a necessary party defendant herein,

without which no legal determination of the matters involved can be had.

(6) The master erred, after finding that plaintiff must necessarily enlarge its capacity at an expense of not less than $1,600,000, in assuming:

"That this amount should be added to the stipulated value of complainant's plant used in the public service, for the purposes of this case."

(7) The master erred in holding that "gas unaccounted" for should be estimated at as much as 11 per cent. of the total gas produced, and in not holding that no more than 8 per cent. should be so allowed.

(8) The master erred, in that he allowed as operating costs to the plaintiff excessive sums for coal, oil, repairs, clerical expenses (auditing), and uncollectables.

(9) The master erred in holding that 8 per cent. on the investment was a fair return.

No exception not assignable to one of the foregoing heads, seems to me worthy of mention.

I. This fundamental exception is necessarily disposed of by the ruling of Learned Hand, J., in Consolidated Gas Co. v. Newton, 267 Fed. 231, unless I should feel obliged in conscience to disagree with my colleague. Under all ordinary rules of procedure, Judge Hand's opinion is now the law of this court.

[1] But I am not in the least inclined so to disagree. The object of the statute has been well pointed out in People ex rel. New York Railways Co. v. Public Service Commission, 223 N. Y. 378, 119 N. E. 848. It is to make the method of accounting by regulated corporations uniform, "so that the accounts could be readily comprehended by those required to examine the same." The object is "not to regulate the management of their finances, but to show what the management was." While the Public Service Commissions in this state are not in any full sense ratemaking bodies, they may be described as the eyes of the commonwealth, to keep watch on the public utilities of the state. It is for this purpose that they are authorized and indeed directed to regulate account keeping, to the end that the act of seeing what has been done may be easily performed.

The system is now almost nation-wide, and the most prominent example of its application is the system of railway accounting promulgated and enforced by the Interstate Commerce Commission. Yet it is said that books so kept are not even prima facie evidence of the facts related therein. Definitions sometimes advance argument, and it is to me material to observe what evidence means. Dean Wigmore, in his well-known treatise (volume 1, p. 3), has collated the historic definitions, and in commenting upon them points out that evidence is always a relative term. Yet there is a constant contained in it, viz. the relation between the proposition to be established and the material evidencing the proposition.

In the matter before the court the proposition to be established is what it costs to make gas, and the logical inquiry is: How would any person interested in that question and acquainted with business go about to ascertain the correct answer? If he found that all gas-

making companies were in the business for profit, and all were required by public authority to keep accounts showing their expenses and charges, would he not first investigate and prima facie accept the results shown by such books? There is but one answer to this inquiry. And when he further learned that such accounts were used by the Public Service Commission (and properly used) whenever complaint was made by the public that the consumer's price for gas was too high, I do not think he could doubt that the books were of the same evidential value as always, when the question propounded was whether the rate compelled the maker to manufacture gas—by means of impairment of capital.

The use of entries kept in the regular course of business, and of abstracts of such entries, when the practical inconvenience of producing the entrants on the witness stand plainly outweighs the probable utility of so doing, has greatly increased of late years, and properly so. Otherwise modern business could not be investigated in courts. Confining reference to the appellate court of this circuit, instances may be found of using the train sheet of a train dispatcher (Chesapeake, etc., v. Stojanowski, 191 Fed. 720, 112 C. C. A. 310); books kept even by assistant weighers and in a criminal cause (Heike v. United States, 192 Fed. 83, 112 C. C. A. 615); the books of banks and abstracts from them as evidence against the bank official under indictment (Parker v. United States, 203 Fed. 950, 122 C. C. A. 252); similar books as against the surety of a dishonest employé in a civil suit (American Surety Co. v. Pauly, 72 Fed. 470, 18 C. C. A. 644, affirmed 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977); any maritime papers commonly kept under international maritime customs (Grace v. Browne, 86 Fed. 155, 29 C. C. A. 621; Bacon v. Conroy, 172 Fed. 532, 97 C. C. A. 158); and the books of controlled and controlling corporations in Barber, etc., Co. v. Forty-Second Street Co., 180 Fed. 648, 103 C. C. A. 614.

The exceptions referred to under this head are overruled.

[2] II. Relying upon the rule of Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, it is asserted in various forms that a year and a half of such a time of trouble as has afflicted the world during and since the World War is too short a period to enable any court (and presumably any other tribunal) to measure and pass judgment upon a statutory public utility rate. This case is singular, in that the question presented is not whether 80 cents for gas affords a fair return for the making, but what shall be done when it appears that it costs more than 80 cents to make and distribute the gas, before there is or can be any question of profit or return at all.

The point is that the 80-cent rate is confiscatory, not because it does not yield a sufficient percentage on capital, but because to produce it at that price consumes capital. Neither the Willcox Case nor any other decision can be cited to show that any definite or fixed period of experimentation is a necessary prerequisite to a suit of that kind. If plaintiff were getting any return at all another question might be presented, but it is to me a matter of no doubt whatever that a year and

a half is a long enough time to experiment with proved capital losses before applying for relief.

The argument is also made (as a variant of this point) that the times are abnormal, and that corporations like plaintiff are only carrying their share of the public burden in gratuitously distributing gas for a reasonable time. Whether this court has power to consider that argument may be doubtful; but, assuming that it may be considered, I am of opinion that the eleemosynary practice has lasted a reasonable time, and the exceptions under this head are overruled.

[3] III. The contention that plaintiff comes into court with "unclean hands," because it has failed to furnish gas of the statutory candle power, cannot prevail in this district, after the action of the court which granted the temporary injunction in ruling upon this very point. It may be said that the decision of a court of three judges is after all but a District Court decision, and not binding upon the judge who hears the case at final presentation.

In a sense this is true, for the court hearing the application for injunction pendente lite necessarily acts upon affidavits, the potency of which may largely disappear after consideration of the evidence of witnesses subject to cross-examination. But in this instance no cross-examination or additional evidence has changed the situation presented when the motion for temporary injunction was argued.

This plaintiff has (in the language of Judge Learned Hand's recent decision) persistently and deliberately disregarded the candle power requirement. I think it is proven that it has done so of necessity and has not thereby injured any one; but that is, after all, beside the point, if there be anything in the argument.

[4] But I think there is nothing in the argument, unless a plaintiff manufacturer, who cannot pay the bills incurred in making his regulated article (without speaking of profit or return), is obliged to cease operations rather than to give the public something, even though that something be not statutory. This manufacturer might have based its suit on the allegation that the 22 candle power requirement was in itself confiscatory, having regard to the admittedly greater expense of complying with the standard of illumination. Both upon reason and authority the exceptions based upon the foregoing argument are overruled.

[5] IV. The judgment entered in the Supreme Court of the state on March 29, 1920, concluded nothing except matters which became history with the end of 1918. By its specific terms it left further occurrences open for future litigation, and this is the future litigation. The matter may be summed up thus:

It has been held by a final judgment, as yet unreversed, and therefore controlling, that an 80-cent rate for this plaintiff was, if not fairly compensatory, at any rate nonconfiscatory durng 1916, 1917, and 1918. Non constat that the same rate is nonconfiscatory in 1919 and 1920. The Supreme Court of New York did not lay down any proposition opposed to this statement, and had no power so to do, if it had tried. The exceptions under this head are overruled.

[6] V. It having been decided by the court in which I am now sitting, and by the Circuit Court of Appeals for this Circuit, that the city of New York is not a necessary party defendant to an action of this kind, the exceptions relating to that question are overruled upon authority.

[7] VI. The master's finding here complained of is regarded as immaterial; yet for the sake of form the exception is sustained, in so far as the master held that the sum of $1,600,000 "should be added to the stipulated value of complainant's plant used in the public service, for the purposes of this case." The stipulation was that the existing plant was worth at least a certain amount of money, and it went no further. I do not think that it was necessary or proper for the master to add anything to or take anything from this valuation, which, however, seems to me to have no other function under the whole evidence than to put it beyond the bounds of present argument that plaintiff has an actually existing investment of at least $3,300,000, now worth that sum, and all engaged in making gas.

VII. The matter of gas unaccounted for will be considered under plaintiff's exceptions.

VIII. I agree with the master that the variation in measurements between the vendor's and vendee's quantities of coal and oil are trifling, and indeed I go further, and hold it as matter of common knowledge that variations no greater in extent than are here shown do occur, and must occur, as the result of the handling and rehandling of materials of this kind. The exceptions with respect to coal and oil are overruled.

The matter of repairs will be treated of under plaintiff's exceptions.

The item of clerical expenses cannot justly be complained of. In my opinion it has increased less than might be expected by reason of the substitution of women for men in the accounting departments and the territorial expansion of plaintiff's business. The exceptions under this heading are overruled.

The uncollectables are reasonable in amount—indeed, unusually so, having regard to the nature of plaintiff's business; i. e., it has no large customers and supplies small tenant householders. This subject was gone into at great length on the trial in the lower court in Willcox v. Consolidated Co., supra, and the result there reached is confirmatory of the master's finding on this annoying item. All defendant's exceptions under this head are overruled.

[8] IX. I do not find it necessary to express either agreement or disagreement with the master in respect of his holding and finding that 8 per cent. on the investment is a fair return. It would be necessary to express opinion as to what was a fair return, if this case presented the inquiry whether the return actually received was compensatory or confiscatory.

[9] There is no return at all; and, the question being whether it is confiscatory to make gas for nothing, it is not necessary to go beyond that fact in deciding this particular case. It is elementary that courts cannot make rates; they only pass upon rates after they are made. The defendant's exception to the master's holding that 8 per cent.

is a fair return is sustained without prejudice, and solely on the ground that such finding is immaterial to the present cause at the present time.

It follows that, except as above indicated under VI and IX, all defendant's exceptions will stand as overruled.

## Plaintiff's Exceptions.

First. The evidence adduced does show that there is no relation between the heat unit content of gas and its candle power, and that it is true that 22 candle power gas may contain fewer (or more) than 620 B. T. U. per cubic foot. Consequently plaintiff's first exception is sustained as filed, though the materiality and importance of the finding is not perceived.

[10] Second. The substance and effect of the stipulation between the parties referred to in this exception was that for the purposes of this litigation, and not otherwise, the plaintiff had an actual investment devoted to gas making, whereof the value was at least $3,300,000. The report is modified so as to set forth this first fact; but it is further the fact that if for any purpose after decree—e. g., on application made at the foot of the decree when drawn in usual form—either party is dissatisfied with this stipulation or the legal effect thereof or the legal inferences to be drawn therefrom, then either party may seek and obtain opportunity to adduce evidence in respect of value.

[11] Third. The question of "unaccounted-for" gas is both important and perplexing. I am convinced that plaintiff has the kind of plant operating in the kind of territory which is sure to produce a large quantity of unaccounted-for gas. I mean that large customers are conspicuously absent; the service pipes run long distances through sandy soil, and the consumers are of a class that require an excessive amount of metering.

Although legally and nominally in a great city, this particular gas maker is in reality operating in a country town. I think the testimony as to such a concern is plain that up to 12 per cent. loss by "unaccounted-for" gas is habitually taken by experienced men as matter of course. After that such men begin to look for the source of trouble, and are by no means sure of being able to find it.

This is one of those contingencies of business that courts must accept on the basis of experience, and in my opinion the most valuable evidence produced are the tabulations—Defendant's Exhibit D6 and Exhibit D1. The fair way to consider such item of expense (for that is what it really is) is to permit to this corporation (for the years 1919 and 1920) such average loss as has fallen upon suburban or small town companies during the period of observation shown by the exhibits above stated. The matter must rest largely in opinion, yet it cannot be that any percentage actually observed must be allowed because it occurred; there must be a limitation, arbitrary to be sure, but fair because based upon observed experience.

In my judgment 15 per cent. is the limit according to the evidence in this case, and to that extent the plaintiff's third exception is sustained.

[12] Fourth. This exception relates to the item of repairs; it is not large, but it does contain a principle. I agree with the plaintiff that the evidence shows that it or any other gas-making company is entitled to take in its meters for repair after they have been in service five years. Therefore, since the item of repair actually proven does not exceed the expenditure implied in the foregoing finding, the fourth exception of plaintiff is sustained.

Fifth. I do not find it necessary to pass upon this exception, which in substance is covered by the findings already made in this opinion. It follows that the master's report, with the unimportant modifications above indicated, is satisfactory to the court.

The sum of the matter is this: It cost plaintiff, and would have cost any other well-operated maker of gas oil, at least 84 cents to furnish 1,000 cubic feet of gas in the year 1919, and at least 96 cents to do the same thing in 1920.

[13] The fundamental reason for this is that the oil best fitted for the gas maker is also richest in gasoline; therefore plaintiff, and other similarly situated manufacturers, are and have been competing with (especially) the automobile. This difficulty is not temporary, so far as human foresight goes. It may well be that gas makers will be driven back to coking coal; but that does not affect the rights of a concern lawfully organized to make oil gas and possessing no plant for coal gas.

A final decree may be submitted, which will, after appropriate recitals respecting the exceptions to master's report, confirm the report as modified, declare the unconstitutionality of the acts of 1906 and 1916 in respect of rate, award to plaintiff injunction as prayed for, and costs against the appearing defendants. It will also contain the usual provision for applying at the foot of decree for further relief, or for modification or vacation of injunction.

One meaning or implication in this last provision is this: This court will not directly or indirectly announce, fix, or suggest a rate for gas; but, if plaintiff endeavors to charge and collect an inequitable rate, it can vacate its own injunction.