**HILLS v. UNITED STATES.***

No. 8578.

Circuit Court of Appeals, Ninth Circuit.
June 30, 1938.

---

*Rehearing denied Aug. 9, 1938.

Walter M. Gleason and James M. Hanley, both of San Francisco, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., and Robert McWilliams, and Sydney P. Murman, Asst. U. S. Attys., all of San Francisco, Cal., for the United States.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appellant, together with one Moulton, was convicted under an indictment purporting to charge the wilful falsification and concealment of certain material facts in a matter within the jurisdiction of an agency of the United States, punishable under § 35 of the Criminal Code, as amended, 48 Stat. 996, 18 U.S.C.A. § 80. There was a second count under § 37, 18 U.S.C.A. § 88, charging a conspiracy to defraud the United States.

The indictment is predicated upon regulations issued by the Secretary of the Treasury pursuant to authorization given in the Gold Reserve Act of 1934, 48 Stat. 337, 31 U.S.C.A. § 440 et seq. Section 3 of the act, 31 U.S.C.A. § 442, provides that the Secretary of the Treasury shall by regulation prescribe the conditions under which gold may be acquired and held. Gold in any form may be acquired, except on behalf of the United States, only to the extent permitted by, and subject to the conditions prescribed in, such regulations. Section 35 (a) of the regulations promulgated under the authority of this act authorizes the mints to purchase "gold recovered from any deposits in the United States or any place subject to the jurisdiction thereof, and which shall not have entered into monetary or industrial use."

Section 38 of the regulations has to do with gold of this character. It provides that the mint shall not purchase any gold under clause (a) of section 35 unless the deposit is accompanied by a properly ex-

ecuted affidavit. Three different types of affidavit are prescribed, depending upon the person who delivers the gold for sale. If delivered to the mint by persons who have mined or panned it, an affidavit on Form "TG-19" is to be filed. Gold delivered by persons who have recovered it in the regular course of their business of operating a custom mill, smelter, or refinery, must be accompanied by an affidavit on Form "TG-20." Persons who have purchased such gold directly from the persons who have mined or panned it are required to present an affidavit on Form "TG-21," giving (a) the names of the persons from whom the gold was purchased; (b) the amount and description of each lot of gold purchased; (c) the location of the mine or placer deposit from which each lot was taken; and (d) the period within which such gold was taken from the mine or placer deposit. The present case concerns an affidavit of the last type.

█ The appellant separately demurred to the first count as not charging an offense against him under § 35, 18 U.S.C.A. § 80.

The material portions of the statute are as follows:

" * * * whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition * * * in any matter within the jurisdiction of any department or agency of the United States * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The first paragraph of the count attempts to charge in the language of the statute, but states only that appellant wilfully falsified "a material matter." The words "a material fact" are omitted. Obviously, it is the falsification and concealment of facts leading to the sale, and not of the whole of the "matter" of the purchase under the statute, in which the government is engaged, which constitutes the offense. This deficiency in the first paragraph would be cured were there alleged elsewhere in the count facts inducing the purchase which were falsified or concealed. We are unable to discover their presence.

The count contains a full charge of the violation of the statute by Moulton. In substance it is alleged that Moulton procured the sale of certain gold to the United States Mint at San Francisco by an affidavit falsely representing that the gold was purchased by Moulton from certain named persons who had mined or panned it, whereas in truth it had been mined or panned by others than those named. The mint officials could not purchase the gold unless they received the affidavit required by the treasury regulation.

Hills is attempted to be charged as an accessory to Moulton's offense. His connection with the transaction was alleged to be that he had signed with fictitious names and delivered to Moulton certain printed forms prepared by the State of California for the use of persons carrying on the business of purchasing for sale ores, concentrates, gold and gold bullion under the state laws. Moulton was said to have filled in these forms so as to make them appear to be reports of the production of gold therein described by the persons whose names appeared to be signed to the forms. It was charged that Hills gave these fraudulent forms to Moulton in order to enable the latter to incorporate the fictitious names in the affidavit required to be furnished to the mint. But it is nowhere alleged that Moulton did in fact use these names in this affidavit. The allegation relied upon by the Government is:

" * * * that said printed forms signed by Hills, as aforesaid, were given to said defendant Moulton by said defendant Hills *for the purpose* of enabling said defendant Moulton to use and incorporate the fictitious names appended to said statements as the names of the producers and sellers to said defendant Moulton of the gold described in the affidavit and statement required of and used by him in connection with the sale by him of said gold to the United States Mint; that said defendants Hills and Moulton at all times knew that said gold so described in said reports and said affidavit had not been produced by the purported persons whose names appeared to be subscribed thereto, but had been produced and mined by other persons, and that they, the said defendants, knew said statements were false and fictitious." (Italics supplied.)

This states no more than that Hills knew that Moulton's affidavit falsely described the producers of the gold; but mere knowledge of the commission of an offense by Moulton does not constitute Hills an ac-

cessory principal. Nor does Hills' "purpose" to aid Moulton in such an offense, without that purpose resulting in an act which aided Moulton, constitute Hills such accessory.

The crime of conspiracy to violate the statute may possibly be spelled out in the first count of the indictment, but the Government claims that the charge is that of accessory principal and not conspiracy, such as is charged in the second count. So far as concerns the appellant, Hills, it is obvious that "in case any other proceedings are taken against him for a similar offense * * * the record [of conviction on the first count would not show] with accuracy to what extent he may plead [it as] a former acquittal or conviction." Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861.

The judgment of conviction on the first count must be reversed with instructions to dismiss the indictment.

 The second count upon which Hills was convicted is also claimed to be insufficient. As has been said, this charges a conspiracy to defraud the United States, under § 37 of the Criminal Code, 18 U.S.C.A. § 88. Appellant claims that the allegation that he and Moulton agreed together to effect the sale of the gold by falsely concealing in the affidavit required by the regulations the true source and origin of the gold, is not a sufficient charge of conspiracy "to defraud" the United States, because there is no allegation that the United States suffered any pecuniary damage or property loss in the purchase.

There is no merit in this contention. The United States Mint was engaged in the purchase of gold, and, under the Gold Reserve Act of 1934, the right to purchase it was dependent upon the showing by an affidavit of its true source and origin. The use of the false affidavit constituted deceit, craft and trickery, and the effectuation of the sale by means not honest. The conspiracy thus sought to interfere with and obstruct the function of the Government in the purchase of gold. It is not necessary to allege or show that there was a loss in the transaction. Such an obstruction of a governmental function by such means is a fraud within the meaning of the relevant statute. Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann.Cas. 1112; Hammerschmidt v. United States, 265 U.S. 182, 187, 44 S.Ct. 511, 512, 68 L.Ed. 968. See also United States v. Cohn,

270 U.S. 339, 346, 46 S.Ct. 251, 253, 70 L. Ed. 616.

 It is contended that the Gold Reserve Act of 1934 is unconstitutional in that it unlawfully attempts to delegate legislative power to the Secretary of the Treasury. Without discussion on the point, it is sufficient to say that appellant was indicted under a statute designed to protect the United States against fraud and imposition. Ct. 468, 82 L.Ed. ——, and United States v. In Kay v. United States, 303 U.S. 1, 58 S. Kapp, 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. ——, it was pointed out that Congress is entitled to protect the Government against those who would swindle it, regardless of questions of constitutional authority to conduct the particular operation. The principle announced in these decisions is controlling here.

 Reversal is asked on the ground that the trial court erred in sustaining objections of the Government to the introduction of certain testimony concerning a practice followed by parties purchasing gold from producers. A proper understanding of the assignments dealing with this subject requires some discussion of the evidence. It is clear that the evidence in question bears upon the count in the indictment which we have upheld, as well as upon the count which we have determined to be insufficient.

A witness for the Government testified that the appellant asked him to aid in signing fictitious names to a number of source slips—that is, forms referred to in the indictment and required by state law to be made out in reporting the source of production of bullion or ore. The witness said that he signed with fictitious names a number of these slips and that appellant did likewise. The appellant admitted signing the slips with the names of other persons, but denied that the names were fictitious. On the contrary, he testified that the men whose names he signed to the slips were miners who had left gold with him to be sold to Moulton. The latter was a licensed purchaser. Printed forms of the required state report not being available at the time the miners brought in their gold, appellant testified that he obtained these forms later from Moulton and signed to them the names of the sellers.

During the period involved large numbers of itinerant miners were engaged in placer operations along the streams. The

accused sought to show that it was a frequent custom of these miners to send in their gold to town for sale to the merchants by one of their number who might chance to be going in for supplies. The person bringing in the product acted in such instances as the agent of the others and signed their names to the source slips. Evidence of this practice was offered in explanation of the admitted conduct of the appellant in signing the particular ,slips with the names of the miners who had left their gold with him for sale.

. On behalf of the accused a miner testified to the custom. He was asked what the procedure was in signing the·source reports with the names of the persons for whom gold had been brought in. The question was objected to on the ground that the claimed practice was a violation of law and that evidence with respect to it was immaterial. The trial court sustained the objection, and in so doing agreed with counsel for the ·Government that the practice was illegal.

Moulton, called as witness for the defense, testified that in many instances it was not feasible for the actual producers personally to sign source slips, and that he had received permission from the state authorizing the signing by other persons.· His testimony in this respect was stricken on motion ·of the Government, apparently on the ground that the state authorities could not sanction a violation of the Federal law.

The regulations do not require that source slips, or any other documents, be signed by the actual producers. All that is required is the affidavit of the purchaser on presentation of the gold to the mint. Nor, as we read them, do the regulations prohibit licensed buyers from purchasing gold from producers through the agency of others. The gravamen of the charge here was that the accused conspired to impose upon the United States by falsely representing that certain non-existent parties had produced and sold to them the gold offered to the mint, well knowing that it had been mined by others. They were not charged with unlawfully signing production records, or with purchasing from highgraders, or with buying gold from or through others than the actual miners. They might have done all these things and still be innocent of the particular charge made against them.

The proof of appellant's participation in the conspiracy was based largely upon his having signed production reports with the names of others. The theory of the prosecution was that these were fictitious names, concocted with the view of covering up the true source of the gold. As a step in its proof, witnesses for the Government testified that the signatures were in appellant's handwriting.

Appellant's version was that the named persons were miners who had panned the gold and who had, as a matter of convenience to themselves, left the gold with him to be sold to Moulton. He admitted that the signatures were in his handwriting. Without adequate explanation, his conduct in signing other people's names to factual ·reports might well have been considered so extraordinary as to cast doubt upon his veracity. In these circumstances, he was entitled fully to explain his conduct. Evidence showing that his action was in conformity with an approved custom would have a tendency to demonstrate the rea-· sonableness of his conduct and hence to strengthen belief in what he said. It was proper for him to prove, if he could, that in the mining districts it was not unusual for one person to sign production reports with the names of others who were the producers, and that this practice was known to the state authorities and sanctioned by them. The existence of such custom—not violative, so far as we ·have been made aware, of any Federal law or regulation—would tend not only to corroborate appellant's testimony, but to relieve his act of inferences of wrongdoing. While evidence of this·character would to some extent open a field of collateral inquiry, it must be borne in mind that the good faith of the accused, or the lack of it, was of the essence of the transaction.

The· Government made slight effort to show directly that the supposed producers named in the affidavit were non-existent, or that they had not mined the gold deposited by Moulton with the mint. Its evidence was largely circumstantial. Main reliance was placed on proof tending to show that the accused parties encouraged highgrading and habitually purchased from highgraders—proof, if accepted, clearly warranting an inference of motive for concealing the source of gold purchased. The proof in this respect took a wide range. In controverting it, the accused were entitled to equal latitude. Any evidence tending to relieve them of the imputation of wilful deception, or to establish their good faith, was proper and should have been ad-

mitted. We think the opportunity to make such proof in the respect indicated was unduly restricted, with the result that appellant was not accorded a fair trial.

The reason given for excluding the proffered evidence served only to intensify the prejudicial effect of its exclusion, the admitted conduct of the accused being thus enveloped in an aura of illegality. Instead of correcting any misapprehension on this score, the court in his instructions intensified the harm by a random observation to the effect that "no custom or practice can authorize or sanction the violation or disregard of any Federal law."

The judgment is reversed with orders to dismiss as to the first count and to grant a new trial as to the second.

MATHEWS, Circuit Judge, concurs in the result.