## BOST v. UNITED STATES.

### No. 8768.

Circuit Court of Appeals, Ninth Circuit.

April 27, 1939.

James M. Hanley, of San Francisco, Cal., and Ray T. Coughlin, of Sacramento, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., and Robert L. McWilliams and Sydney P. Murman, Asst. U. S. Attys., all of San Francisco, Cal.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

Ben A. Bost, the appellant, in an indictment consisting of five counts, filed March 30, 1937, was charged with viola-

tion of the Act of June 18, 1934,[1] tried, found guilty on all five counts, sentenced to five years imprisonment under each count, sentences to run concurrently, and fined the sum of $5,000 under the first count. He appeals from said judgment.

April 6, 1934, the appellant presented one bar of gold bullion at the United States Mint in San Francisco for sale to the United States Government, together with an affidavit on Form TG-19, required by the regulations promulgated by the Treasury Department under the Gold Reserve Act of 1934.[2] This affidavit recited the affiant, Ben A. Bost, of Nevada City, Calif., to be the owner of the Lucky Gravel Claim, located in "Cougher Canyon," Eldorado County, Calif.; that the source of the gold was in said claim, "mostly small nuggets"; that the gold was recovered from "200 cubic yards" of gravel or ore, in the period from October 1, 1933, to March 31, 1934; that the date upon which the gold was first melted into crude metallic gold suitable for refining was April 5, 1934. The affidavit went on to state:

"The gold referred to herein was recovered by this depositor by mining or panning and no part thereof has been held by this depositor or to the best of my knowledge, information and belief, by any other person at any time in noncompliance with the

---

[1] Section 35 of the Criminal Code of the United States, 48 Stat. 996, 18 U.S.C.A. § 80 (quoted): "Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, * * * any claim upon or against the Government of the United States, or any department or officer thereof, * * * knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or, make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

[2] Gold Reserve Act of 1934, 48 Stat. 337, 340, 31 U.S.C.A. § 442: Sec. 3. "The Secretary of the Treasury shall, by regulations issued hereunder, with the approval of the President, prescribe the conditions under which gold may be acquired and held, transported, melted or treated, imported, exported, or earmarked: (a) for industrial, professional, and artistic use; (b) by the Federal Reserve banks for the purpose of settling international balances; and, (c) for such other purposes as in his judgment are not inconsistent with the purposes of this Act [section 441 of this section]. Gold in any form may be acquired, transported, melted or treated, imported, exported, or earmarked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by, and subject to the conditions prescribed in, or pursuant to, such regulations. Such regulations may exempt from the provisions of this section, in whole or in part, gold situated in the Philippine Islands or other places beyond the limits of the continental United States."

Provisional Regulations issued under the Gold Reserve Act of 1934 by the Secretary of the Treasury and approved by the President of the United States:

"Sec. 35. The mints, subject to the conditions specified in these regulations, and the general regulations governing the mints, are authorized to purchase:

"(a) Gold recovered from natural deposits in the United States or any place subject to the jurisdiction thereof, and which shall not have entered into monetary or industrial use; * * *

"Sec. 38. Gold recovered from natural deposits in the United States or any place subject to the jurisdiction thereof.——

"(1) The mints shall not purchase any gold under clause (a) of section 35 unless the deposit of such gold is accompanied by a properly executed affidavit as follows:

"An affidavit on form TG-19 shall be filed with each delivery of gold by persons who have recovered such gold by mining or panning in the United States or any place subject to the jurisdiction thereof: Provided, however, That such persons delivering gold in the form of nuggets or dust having an aggregate weight of not more than 5 ounces, which they have recovered from mining or panning in the United States or any place subject to the jurisdiction thereof, may accompany such delivery with full and complete information on form TG-19 without the requirement of an oath."

Act of March 9, 1933, any executive order or orders of the Secretary of the Treasury issued thereunder, or in noncompliance with any regulations prescribed under such order or license issued pursuant thereto, or in noncompliance with the Gold Reserve Act of 1934, or any regulations or license issued thereunder. No part of such gold has ever entered into monetary or industrial use.

"I make this affidavit for the purpose of inducing the purchase by a United States Mint or assay Office of gold described herein under and in accordance with the provisions of the Gold Reserve Act of 1934 and the regulations issued thereunder."

The appellant offered gold at the United States Mint in San Francisco for sale to the United States on four other occasions and in each instance accompanied the gold with a similar affidavit. The indictment was drawn in five counts, each offer and accompanying affidavit being treated in a separate count.

Acting under instructions of his superior to make an investigation of persons suspected of handling and dealing in stolen high grade gold ore, R. C. Lynn, a special agent of the Bureau of Internal Revenue, made a search of the records of the United States Mint at San Francisco for the names of licensed gold buyers or former licensed gold buyers in Nevada County, Calif. Among the names was that of Ben A. Bost, upon whom Lynn called in Nevada City, Calif., August 8, 1936. Bost told Lynn the gold sold by him to the Mint in 1935 was produced from the Lucky Gravel mining claim of which he owned the mineral rights and that the mine was located approximately 40 miles north of Georgetown, Calif., possibly in Eldorado County, Calif.

Lynn next saw Bost on August 24, 1936, at which time he told Bost that he had made a search to find the Lucky Gravel mining claim, without success, and offered to furnish transportation if Bost would show him the mine. Bost informed Lynn that he would be unable to do so for the reason that he had seen the mine on but one occasion, five or six years before, and did not recall the route he had taken.

On September 18, 1936, Lynn again called upon Bost, this time accompanied by William Malloy, a deputy collector of Internal Revenue. Lynn told Bost on this occasion that he was unsuccessful in his search for the mine, had not been able to find anyone who had ever heard of it, and wanted to question Bost further. He then placed Bost under oath, and Bost related a story describing how he became financially interested in the Lucky Gravel, how he journeyed there at night, spent a day there and returned next morning to his home.

Lynn further testified that he had made extensive searches and inquiries throughout the vicinity described by Bost but failed to find the Lucky Gravel Claim or Cougar Canyon, or the asserted lessees of Bost, namely Swissler, Larsen and Hensen, and that he failed to find anyone who had heard of any of them.

Other witnesses were produced by the Government, residents of the neighborhood, who testified that they had never heard of Lucky Gravel claim, Cougar Canyon, or of Swissler, Larsen or Hensen. One witness said that he had heard of a Cougar Canyon when he was a boy, 48 or 50 years before, and again, about 2 years before the trial, when he was asked whether he knew of such a place, but he had never been there and had no more than a vague idea of where such a canyon might be located.

In addition, the County Assessor of Eldorado County was called as a witness and testified that he was familiar with the assessment rolls of the county; that such records were kept under his supervision; that there had not been any tax assessment on any claim known as the Lucky Gravel claim in Eldorado County nor had there been any tax assessment in said county against any individual named Hans Hensen, G. A. Swissler or Larry Larsen or Ben Bost. The County Surveyor of Eldorado County testified that in all his 40 years of residence in Eldorado County he had never heard of Cougar Canyon or any claim known as Lucky Gravel, or of miners named Hans Hensen, G. A. Swissler or Larry Larsen. The County Surveyor of Placer County, which adjoins Eldorado County testified in like vein.

There was testimony from other witnesses for the Government also indicating that the canyon, mine and miners were wholly fictitious.

The defendant produced four character witnesses, each of whom testified that the defendant bore a good reputation in his community.

The defendant had lived in Nevada City, Calif., ever since his birth and operated a general assay office there from 1907 to March, 1934. He testified that a man named Swissler, whom he had known in 1886 in the town of Deadwood, Trinity County, Calif., and whom he had not seen since, called at his office in 1928, told him that he (Swissler) was prospecting and wanted Bost to advance him $250 to proceed with his work; that Swissler said he thought he would strike pay gravel; that Bost advanced the $250 and occasionally thereafter Swissler came in with small amounts of gold; that Swissler had not named the mine and Bost called it the "Lucky Gravel"; that Swissler told Bost it was located in Cougar Canyon, in Eldorado County. Bost further gave testimony that Swissler called upon him late in October, 1930, and wanted more money and when Bost said that he wanted to see the mine, Swissler offered to show him; that they went by automobile to Rattlesnake Bar bridge, about 7 miles below Auburn on the Middle Fork of the American River; that they started from there at 6:30 p. m. on burros, traveling from 30 to 40 miles over a trail; that they arrived at the mine at 3:30 a. m. and stayed all that day; that there was a 900 foot tunnel and a small stream of water on the claim; that the tunnel ran 800 feet through lava formation before striking gravel; that he examined the tunnel and panned some of the gravel; that he rested all that afternoon and night; that Swissler and he left there at 5:30 a. m. for Auburn, starting toward Georgetown on an abandoned road, meeting a camper on the way who took Bost into Auburn, while Swissler presumably returned to the mine; that Bost arrived in Auburn at approximately 1:30 p. m. Bost said that he became half owner of the mine when he paid Swissler $250 on the occasion of the first visit of Swissler to his office in 1928, and full owner on the visit to the claim in 1930 upon payment of $245. According to Bost's testimony, Hensen was at the mine when Bost arrived; Hensen brought gold to Bost six times; Bost last saw him in Nevada City, September, 1935, at which time Hensen is alleged to have told him the gravel had all been worked out and that more money would be needed to prospect further. Bost also testified that he was sure the claim had not been recorded because he had named the claim and because Swissler said he (Swissler) owned the ground.

Cross examination of the defendant disclosed that the mine was old and had theretofore been abandoned—"worked in early days;" that Swissler had given his receipt to Bost for the $250 payment in 1928, but it had been destroyed; that at one time Swissler brought in a lot of gold of 40 ounces; that Bost had no recollection of the number of deposits or shipments of gold turned over to Bost by Swissler between 1928 and 1930, because he kept no "record of those things." In January, 1932, according to Bost, Swissler, Hensen and Larsen appeared at his office and stated that they wanted a lease on the Lucky Gravel claim, and a typewritten page was offered in evidence purporting to be such lease signed by Bost, Swissler, Hensen and Larsen, and granting 10% of the profits of the mine to Bost.

The appellant contends: "I. The indictment wholly fails to state any Federal offense by appellant. II. The evidence is insufficient to warrant or sustain appellant's conviction under all five counts. III. The District Court committed various prejudicial errors in the admission and rejection of evidence at the trial of the case."

The appellant urges, under the first contention, raised through the medium of a demurrer to the indictment, (a) that the indictment fails to set out with definiteness just where the affidavit of Bost was false; (b) that it does not allege that the type of gold deposited by Bost required the affidavit in question; and (c) that the indictment uses the words "material matter" rather than the statutory words "material fact." All five counts of the indictment are couched in the same terms, save that each relates to a separate offer by Bost to sell gold to the mint, and, therefore, need not be discussed separately. Points (a) and (b) are wholly lacking in merit and are answered by a reading of the indictment. As to point (c), this court has heretofore discussed and passed upon the problem, stating the law as follows: "The first paragraph of the count attempts to charge in the language of the statute, but states only that appellant wilfully falsified 'a material matter.' The words 'a material fact' are omitted. Obviously, it is the falsification and concealment of facts leading to the sale, and not of the whole of the 'matter' of the purchase under the

statute, in which the government is engaged, which constitutes the offense. This deficiency in the first paragraph would be cured were there alleged elsewhere in the count facts inducing the purchase which were falsified or concealed. We are unable to discover their presence." Hills v. United States, 9 Cir., 97 F.2d 710, 712.

The indictment here specifically alleges the facts as required by the Hills case, supra, in the following language: "That he was the owner of a mining claim called the 'Lucky Gravel' claim, and that the source of said gold so tendered and deposited was 'Lucky Gravel claim, mostly small nuggets', and that said gold had been recovered from said claim, which claim it was stated in said affidavit was located in Cougar Canyon, Eldorado County, California, whereas in truth and in fact as said defendant then and there well knew, he was not the owner of any mining claim in said County and State, known as or called the Lucky Gravel claim, and said gold had not been recovered from said alleged claim, which facts said defendant at all times well knew."

We conclude, therefore, the indictment was sufficient in form and substance.

■ The appellant next argues the insufficiency of the evidence, contending that where the facts are as consistent with innocence as with guilt, the conviction cannot be sustained. But the facts here, if believed by the jury, are not as consistent with innocence as with guilt, even if we should assume that this test of the evidence may be made by us which we do not do. The appellant brought gold to the United States Mint and, to induce purchase by the mint, made an affidavit as prescribed by the regulations. The agents of the Government were not obliged to believe the averments and attempted verification met with failure. Testimony was introduced tending to show that the Government agents made diligent search for the mining claim, but were unable to locate either the claim or the canyon in which it was supposed to be found and Bost was of no assistance. These facts, if believed, prove that Bost's affidavit was false and he failed to substantiate it; his story was so inherently improbable as to be utterly unworthy of belief. The case was made out under 18 U.S.C.A. § 80, if the jury chose to disbelieve the defendant.

■ The final phase of the case relates to asserted errors in the admission of evidence, the first question thereunder concerning the introduction in evidence, over objection of defendant, of a map of Eldorado National Forest, and certain topographical maps of the vicinity. The maps were offered, as was explained by Government counsel, "for the purpose of showing that on none of them, notwithstanding the detail with which they were prepared, did Cougar Canyon appear, though many other canyons and other topographic features were shown." The map of Eldorado National Forest was marked: "U. S. Department of Agriculture Forest Service," and was introduced during the testimony of H. C. Sedelmeyer, a civil engineer with the United States Forest Service, who identified it as an official map. Harry D. McGlasham, an assistant geological engineer for the United States identified official maps of the United States Geological Survey, covering Eldorado County, which were received in evidence as Exhibit 3. Counsel for defendant objected to the introduction of both exhibits on the ground of hearsay.

It is apparent from these printed maps, brought up as exhibits, that they are, to all intents and purposes, official maps of the departments of the United States Government which prepared them. The appellant in United States v. Romaine, 9 Cir., 255 F. 253, 254, 255, introduced in evidence certain hydrographic maps made by the United States Coast and Geodetic Survey, which the trial court disregarded. This court said, "We think the maps should be given full credence, and should be taken as absolutely establishing the truth of all that they purport to show. * * * the court might properly take judicial notice of the accuracy of the official plats of the United States Coast and Geodetic Survey."

These maps, being originally prepared by trained and competent employees of the United States Government in pursuance of their official duties, and in general use, are clearly within the same exception to the hearsay rule as Judge Parker had in mind in Long v. United States, 4 Cir., 59 F.2d 602, 603: " * * * It falls clearly within the principles under which exceptions to the hearsay rule are admitted; i. e., necessity and circumstantial guaranty of trustworthiness. Wigmore on Evidence, vol. 2, § 1420 et seq. and vol. 3, §§ 1630–1636. As to trustworthiness, it is made by an official of the government in the regular course of duty, who presumably has no motive to state anything but the

truth, and it is made to be acted upon, and is acted upon, in matters of importance by officials of the government in the discharge of their duties." Compare 22 C.J. § 1114, pp. 910–913; 22 C.J. § 1430, pp. 1085, 1086; Chesapeake & Delaware Canal Co. v. United States, 3 Cir., 240 F. 903, 907.

█ Next brought to our consideration are the assignments of error relating to the admission of testimony in certain instances, over objection of defense counsel. These assignments afford no basis upon which this court may find error in the conduct of the trial below, being vague and indefinite, failing to place the instances, and not disclosing the name of the witness whose testimony is asserted to be objectionable. Furthermore, our study of the record convinces us the assignments are without merit.

The judgment is affirmed.